740 F.2d 220
 11 Collier Bankr.Cas.2d 28, Bankr. L. Rep. P 69,942,
38 UCC Rep.Serv. 1425
 In the Matter of MARIN MOTOR OIL, INC.
MONTELLO OIL CORPORATION Cities Service Company, Appellant,
v.
MARIN MOTOR OIL, INC., David P. Michaels, Trustee, and
Cities Service Company, Appellees.
 No. 83-5500.
 United States Court of Appeals,
Third Circuit.
 Argued March 9, 1984.
Decided July 24, 1984.
 
 Leslie H. Rudnick (Argued), Ring & Rudnick, Boston, Mass., for appellants.
 Andrew S. Polito (Argued), Mattson, Madden & Polito, Newark, N.J., for appellee Cities Service Co.
 Jack M. Zackin (Argued), Ravin, Greenberg & Zackin, P.A., Roseland, N.J., for appellee David P. Michaels, Trustee of Marin Motor.
 Before HUNTER and BECKER, Circuit Judges, and KATZ, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This case presents several difficult questions involving the interpretation of section 546(c) of the Bankruptcy Code, 11 U.S.C. Sec. 546(c). Section 546(c) adopts the "seller's right of reclamation" created by section 2-702 of the Uniform Commercial Code, which enables a seller to reclaim its goods "upon demand made within ten days after receipt" of the goods by the buyer. Section 546(c) allows the seller to exercise this right after the buyer has filed a bankruptcy petition, but requires that the demand be made in writing.
 
 
 2
 Montello Oil Corporation ("Montello"), the seller in this case, seeks to reclaim goods that it sold to Marin Motor Oil, Inc. ("Marin") on credit. Marin received the goods while insolvent and subsequently filed for bankruptcy. Montello claims that a written demand that it sent by telex to Marin at 11:04 P.M. on April 21, 1981, the date which Montello claims was the tenth day after Marin received the goods, is sufficient to satisfy the demand requirement of section 546(c). Montello also claims that its filing of a law suit in state court on April 16, 1981, the service of the complaint on Marin, and the issuance of a temporary injunction restraining Marin from alienating any of its assets and requiring Marin to segregate the proceeds of any prior sales of the goods received from Montello, was sufficient to notify Marin that Montello was asserting its right of reclamation. Marin, by contrast, contends that the demand sent on April 21 was not timely, and thus not effective under section 546(c). With respect to the law suit, Marin concedes that the complaint and temporary injunction were served within the ten-day period, but argues that they do not constitute a written demand for reclamation within the meaning of section 546(c), because they do not explicitly assert a right of "reclamation." The bankruptcy court agreed with Marin and held that the law suit did not constitute an effective demand for reclamation, and that, since the telex was not received within the ten-day period, it was not a timely demand for reclamation. The district court affirmed.
 
 
 3
 We conclude that section 546(c) requires that a written demand for reclamation explicitly state that it is asserting that right, and we therefore hold that the state court law suit does not satisfy the demand requirement of section 546(c). In determining whether the telex satisfied the demand requirement, we must address two questions: at what point did Marin receive the goods in question and thus start the ten-day period running, and whether the demand is made when sent by the seller or only when it is received by the buyer. In this case, seller Montello shipped the goods on April 10, via a common carrier barge hired by buyer Marin. The goods were received by Marin's bailee on April 11. The question raised by these facts is whether "receipt" by Marin took place on the 10th or the 11th. If we conclude that receipt took place on the 10th, we need not reach the other question since the telex sent on the 21st would clearly be untimely under either a "dispatch" or "receipt" rule. We conclude, however, that receipt within the meaning of section 546(c) did not occur until Marin's bailee took actual physical possession of the goods from the carrier, on April 11. Having made this determination, we must also decide whether the "demand" for reclamation took place on April 21, when the telex was dispatched, or on April 22, when it was received. Adopting the equivalent of the "mailbox" rule, we conclude that a demand made pursuant to section 546(c) is effective on dispatch, as long as it is made in a commercially reasonable manner. We therefore hold that Montello's telex was a timely demand, and we reverse the judgment of the district court, 30 B.R. 827, and remand for further proceedings.
 
 I. FACTUAL AND PROCEDURAL HISTORY
 
 4
 On March 24, 1981, Montello Oil Corp., which is located in Dedham, Massachusetts, contracted to sell to Marin Motor Oil, Inc., which is located in Elmwood Park, New Jersey, 1,054,000 gallons of regular leaded gasoline at $0.9725 per gallon, FOB, New York Harbor, any day in April, 1981. Marin agreed to pay for the gasoline within one day after delivery and receipt by Marin of a certificate of inspection by an independent inspector as to the quality and quantity of gasoline.
 
 
 5
 In accordance with the contract, Marin called Montello on April 10, 1981, and arranged for a commercial barge operated by a common carrier to pick up the gasoline from Montello's terminal in New York Harbor. The barge arrived at the Montello terminal that same day at 3:05 p.m., and loading of the gasoline was completed at 8:35 p.m. that evening. At 9:15 p.m. the barge departed Montello's terminal and proceeded to Cities Service Company's (Cities') terminal in New Jersey, where Marin had storage rights pursuant to a terminalling agreement between Cities and Marin. The barge arrived at Cities' New Jersey terminal at 10:30 p.m. on April 10, 1981, and at 12:01 a.m. on April 11, 1981, began unloading the gasoline into Cities' storage facility. The unloading took approximately 13 hours and was completed by 1:05 p.m. on April 11.[1] On April 13, 1981, Marin received Montello's invoice in the amount of $1,032,570.35 and the independent inspector's certificate of compliance.
 
 
 6
 On April 16, 1981, Thomas McManmon, Montello's Vice-President, went to Marin's office in Elmwood Park, New Jersey and orally demanded payment of Montello's invoice, or, in the alternative, return of the gasoline. On the same day, Montello filed suit against Marin in New Jersey Superior Court seeking a writ of attachment against all of Marin's assets and an injunction prohibiting Marin from re-selling the gasoline Montello had sold it. The Superior Court entered a temporary injunction enjoining Marin from making any further sales and ordering Marin to place all proceeds from the sale of Montello gasoline into a segregated account. Montello's state court complaint and the court's order were served on Marin on April 20, 1981.[2]
 
 
 7
 On April 21, 1981, Marin filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. On the same day at 11:04 p.m., Montello, through its Massachusetts attorney, transmitted the following demand for reclamation to Marin by telex through Western Union:Pursuant to Section 546(c) of the Bankruptcy Code and pursuant to section 2-702 of the U.C.C., demand is hereby made upon you for the return and reclamation of all gasoline delivered to you 11 April, 1981.
 
 
 8
 The telex was electronically processed by Western Union and was received in Western Union's Paterson, New Jersey office at 11:07 p.m. on April 21st. Montello's telex was physically received by Marin at approximately 9:04 a.m. on April 22, 1981, when Marin opened for business and turned on its telex machine.
 
 
 9
 Thereafter, Montello instituted an adversary proceeding against Marin in bankruptcy courts seeking reclamation pursuant to 11 U.S.C. Sec. 546(c) of the 1,061,769 gallons of gasoline sold to Marin. Montello also sued Cities asserting that Cities was the bailee of the gasoline for Marin and that it was therefore obligated to turn the gasoline over to Montello if Montello was successful in its attempt to reclaim the gasoline from Marin. Cities interposed the affirmative defense that it was a good faith purchaser for value of the gasoline, rather than a bailee of Marin.
 
 
 10
 The bankruptcy court granted Marin's motion for summary judgment on the grounds that (1) the state court lawsuit and injunction could not constitute a written demand for reclamation under section 546(c), because they did not mention reclamation, and (2) the telex demand was not timely, because it was not received by Marin within the ten-day period provided for by section 546(c). The court also denied, without explanation, Cities' motion for summary judgment.
 
 
 11
 Both Montello and Cities appealed the bankruptcy court's order. The district court entered an order affirming the bankruptcy court's grant of summary judgment in favor of Marin, essentially for the reasons set forth in the bankruptcy judge's opinion. The court reversed the denial of summary judgment as to Cities, holding that Montello's inability to obtain reclamation from Marin defeated its claim against Cities. Montello appeals.
 
 
 12
 II. THE RECLAMATION PROVISIONS: Sec. 546(c) OF THE
 
 
 13
 BANKRUPTCY CODE AND Sec. 2-702(2) OF THE U.C.C.
 
 
 14
 Section 546(c)[3] was adopted by Congress in the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code") in order to resolve the question whether U.C.C. Sec. 2-702(2)[4] applies where the debtor files for bankruptcy. The U.C.C. is a state statute and therefore would be preempted by a contrary federal statute. The problem was that the old bankruptcy act did not mention the seller's state law statutory right to reclamation, and it was therefore unclear whether, and to what extent, the right to reclamation was preempted by the federal bankruptcy act. H.R.Rep. No. 595, 95th Cong., 1st Sess. 372; S.Rep. No. 989, 95th Cong., 2d Sess. 86-87, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5872-73, 6327-28. The solution of the drafters of the Bankruptcy Code was essentially to adopt 2-702(2) as part of the federal bankruptcy law, but to modify that section by requiring that the seller had to make a written demand for reclamation.[5]
 
 
 15
 The enactment of section 546(c) in the Bankruptcy Reform Act of 1978 answered the question of the interrelationship between federal bankruptcy law and the state law right of reclamation contained in U.C.C. Sec. 2-702(2). Nonetheless the enactment of section 546(c) left a few loose ends, particularly as the result of the drafter's failure to define several of the terms used therein. We must tie up three of those loose ends on this appeal.
 
 
 16
 III. THE STATE COURT LAWSUIT AND INJUNCTION AS A DEMAND FOR
 
 RECLAMATION
 
 17
 Section 546(c) unambiguously provides that the seller may not reclaim goods from the trustee in bankruptcy unless he first "demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor." Montello argues that the complaint it filed in state court on April 16th, in conjunction with the temporary restraining order issued by the state court against Marin, is sufficient to satisfy the demand requirement of section 546(c).[6] The problem with this argument is that the seller's right to reclamation is not mentioned in either Montello's complaint or the court's restraining order.[7] The complaint seeks only damages and a restraining order prohibiting Marin from "further sales of the gasoline heretofore delivered to it by [Montello] and/or directing that the proceeds of all such sales be held by [Marin] in a segregated account to be released upon direction of the Court." While the complaint seeks attachment of all the debtor's property, including the gasoline, the attachment appears to be in aid of injunctive relief against disposition of funds or assets, which in turn was designed to assure that Montello would be able to recover any damages which it might be awarded when the case was ultimately decided. Reclamation, on the other hand, is a separate remedy explicitly created by the U.C.C. to supplement a seller's right to other legal and equitable relief. We therefore agree with the bankruptcy and district courts that the state court complaint was not sufficient, in the absence of a claim for reclamation, to satisfy section 546(c)'s requirement of a written demand for reclamation.[8]
 
 
 18
 IV. WHAT CONSTITUTES "RECEIPT" OF GOODS FOR PURPOSES OF
 
 SECTION 546(c)
 
 19
 Montello argues that Marin did not "receive" the gasoline within the meaning of section 546(c) until April 11, when the common carrier pumped the gasoline into Cities' storage terminal. Marin argues that it should be deemed to have received the gas on April 10, when Montello pumped the gas onto the common carrier barge which Marin had hired. The practical significance of this dispute is that the date of "receipt" is established by section 546(c) as the day from which to begin counting the ten-day period within which the seller must make a written demand for reclamation. If Marin is correct and "receipt" is deemed to have occurred on April 10th, then, regardless of whether the telex demand is viewed as having been made on April 21st, when it was sent, or 22nd, when it was received, it was not made within the ten-day period provided for by section 546(c).
 
 
 20
 There is no definition of "receipt" in the Bankruptcy Code, but U.C.C. Sec. 2-103(1)(c) defines receipt of goods as "taking physical possession of them."[9] Marin argues that it should be deemed to have taken possession of the goods at the time the gas was loaded onto the common carrier because at that point, under the terms of the sales contract, "title" and risk of loss passed to Marin. The first problem with this argument is that it ignores the plain language of U.C.C. Sec. 2-103(1)(c)--"physical possession"--and it ignores the fact that the U.C.C. does not rely on the concept of "title" for purposes of establishing the rights of buyers and sellers under the Code. See Note, Disengaging Sales Law from the Sale Contract, 96 Harv.L.Rev. 470 (1982).
 
 
 21
 The second problem with Marin's argument is that it ignores U.C.C. Sec. 2-705, which views goods given by a seller to a common carrier for delivery to a buyer as being in the possession of the common carrier not the buyer, and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency.[10] This right to stop delivery applies regardless of which party bears the risk of loss, and regardless of which party is deemed to have "title" to the goods while they are in the carrier's possession. Moreover, under the U.C.C., the right of reclamation--a different right than the right to stop goods in transit--takes effect when the buyer "receives" the goods. See Ceres Inc. v. ACLI Metal & Ore Co., 451 F.Supp. 921, 924, 24 U.C.C.R.S. 140, 144 (N.D.Ill.1978).[11] Therefore, while the gasoline was in the physical possession of the common carrier, it was not in the physical possession of Marin, and Montello's remedy upon discovery of Marin's insolvency was to order the common carrier to stop delivery.[12] Once the gasoline was delivered to Marin's bailee, i.e., Cities, Marin had constructive possession under Sec. 2-705(2) and Montello's right to stop delivery terminated and its right to reclaim the goods under U.C.C. Sec. 2-702(2) arose.[13]
 
 
 22
 For these reasons, we agree with the conclusion of the bankruptcy court and the district court that the date of "receipt" of the gasoline by Marin was April 11, 1981, when the common carrier pumped the gas into Cities' storage facilities.
 
 
 23
 V. WHAT CONSTITUTES A "DEMAND": RECEIPT VS. DISPATCH
 
 
 24
 The final question we must decide is whether Montello made a "demand" within the meaning of section 546(c) on April 21st when it sent the telex at 11:04 p.m., or whether a "demand" requires receipt by the buyer, in which case the demand was not made until April 22nd when Marin turned on its telex machine and received the message. As we have explained, the practical significance of this question is that, if we agree with Marin that a "demand" requires receipt by the buyer, then Montello's telex was not timely because it arrived in Marin's office on the eleventh day after receipt of the goods by Marin.
 
 
 25
 The Bankruptcy Code does not define what constitutes a "demand,"[14] and we have found no cases that address the question whether a demand is effective on dispatch, or only on receipt. Thus this is a case of first impression, and, finding no other source of guidance, we must look to the policy behind section 546(c) to decide what the rule should be.
 
 
 26
 A review of the very brief legislative history of section 546(c) is not instructive. The House Report states only:
 
 
 27
 Subsection (b) specifies that the trustee's rights and powers under the strong arm clause, the successor to creditors provision, the preference section, and the postpetition transaction section are all subject to any statutory or common-law right of a seller, in the ordinary course of business, of goods to the debtor to reclaim the goods if the debtor received the goods on credit while insolvent. The seller must demand reclamation within ten days after receipt of the goods by the debtor. As under nonbankruptcy law, the right is subject to any superior rights of other creditors. The purpose of the provision is to recognize, in part, the validity of section 2-702 of the Uniform Commercial Code, which has generated much litigation, confusion, and divergent decisions in different circuits. The right is subject, however, to the power of the court to deny reclamation and protect the seller by granting him a priority as an administrative expense for his claim arising out of the sale of the goods.
 
 
 28
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 372, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6327-28. The Senate Report, which was issued approximately ten months after the House Report, essentially parrots the House Report. See S.Rep. No. 989, 95th Cong., 2d Sess. 86-87 reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5872-73.
 
 
 29
 Marin asserts that Congress' purpose in enacting section 546(c) was to foster commercial certainty by establishing a flat ten-day receipt rule. It argues that such a rule will do the most to foster commercial certainty because it will allow Chapter 11 debtors and their creditors to know exactly what assets are available to satisfy the debtor's obligations. The major problem with this argument is that the "litigation, confusion, and divergent decisions" that Congress referred to in the legislative history was a reference to the confusion under the old bankruptcy law over whether U.C.C. Sec. 2-702 applied in the context of a bankruptcy filing by the debtor, and if so, to what extent. Congress did not evince any concern in the legislative history to section 546(c) for the alleged problem of certainty in what corporate assets are subject to sellers' reclamation claims. The second problem with Marin's argument is that, although the buyer will gain "certainty" if we adopt a receipt rule, the seller will be uncertain as to his rights because he will not know whether the buyer received the demand within the ten-day period. In short, "certainty," at least as regards the buyer and seller, is a wash: a receipt rule creates certainty for the buyer but leaves the seller in doubt while the demand is "in the mail"; a dispatch rule accomplishes the opposite. We regard Marin's argument that a receipt rule will create greater overall certainty for the other creditors of the buyer, on the theory that the buyer will pass along news of the sellers' reclamation demands to its creditors, to be unrealistic.
 
 
 30
 Montello argues that Congress' purpose in enacting section 546(c) was to adopt U.C.C. section 2-702 in the situation where the buyer files for bankruptcy. Section 546(c) adopts the first half of section 2-702(2) but adds the single modification that the demand must be made in writing. Montello submits that the only conceivable reason for adding the requirement of a writing is evidentiary: the writing requirement serves the purpose of documenting the seller's timely election to reclaim the goods. By requiring a writing, Congress is said to have sought to simplify the administration of bankruptcies by eliminating testimony concerning whether the seller has made a timely oral reclamation demand.
 
 
 31
 Montello's explanation probably correctly deduces the purpose of Congress in adding the requirement of a writing in section 546(c). But it does not resolve the question whether the demand required by section 546(c) must be received by the buyer/debtor or merely dispatched by the seller/creditor within the ten-day period. We have examined the text of section 546(c) and the policies underlying it for evidence that Congress sought to favor the seller or buyer, but we are unable to reach a conclusion. Every argument made by Marin in favor of a receipt rule yields, by merely shifting one's assumptions, an opposite and equally compelling argument that favors a dispatch rule. For example, Marin says that reclamation is an extraordinary remedy and that ten days is already a long time, and therefore that a dispatch rule is improper because it effectively extends that time. Montello rejoins that reclamation is designed to protect the seller's rights and that ten days is already a very short time, and therefore that a receipt rule is improper because it shortens that time further. Our problem is that nothing in the section 546(c) or its legislative history gives us any basis on which to choose between these competing value judgments.
 
 
 32
 There is, however, one policy that we can clearly derive from section 546(c) and its requirement of a writing: Congress favored certainty. Moreover, certainty is a generally desirable policy that should inform the interpretation of any ambiguous statute. The notion of certainty relates not only to simplification of evidentiary disputes, but also to minimizing the number and difficulty of disputes that will arise between the parties. Thus, the certainty question includes whether the disputes that will arise if we adopt a receipt rule are likely to be more or less burdensome on the courts than disputes under a dispatch rule.
 
 
 33
 Under a dispatch rule, there will be very few disputes concerning whether the seller made a timely dispatch; the concept of dispatch is straightforward and the date of dispatch is easily measurable--for example, the court can simply look at the postmark date on the envelope or the electronically recorded date and time that a telex was sent. However, if we adopt a dispatch rule, we must also adopt the requirement that the method of communication chosen by the seller be "commercially reasonable." A holding to the contrary would allow for unfairness and subject the buyer and his creditors to inordinate risk. The question whether the method of communication was reasonable will likely involve the courts in some disputes. In order to resolve these disputes, the courts will have to examine past practice both between the parties and in the industry.
 
 
 34
 A receipt rule, on the other hand, will not involve the courts in an inquiry into whether the method of communication chosen by the seller was reasonable. The only question will be whether the buyer received the demand within the ten-day period. However, we believe that applying a receipt rule in the modern world, where telex and other forms of electronic communication are becoming the norm, will require the courts to become involved in a number of conceptually difficult disputes concerning what constitutes receipt. For example, in this case there is no doubt that Montello's telex demand was sent at 11:04 on April 21st, when Montello's attorney pushed the send button on his telex machine. But what constitutes "receipt" of the message? Apparently, Marin's machine was not turned on between the time Montello sent the message and the next morning, but did the electrons that made up the message proceed along the wires and enter Marin's machine and wait there until the next morning? And would that be enough for receipt? Or suppose the secretary who was in charge of the telex machine for Marin accidentally left the machine on when he left the office at 5:00 p.m. on April 21. In that case, the message would have been visible on the screen in Marin's office, but no one would have been there to read it. Is that enough to constitute receipt? The possibilities are endless, but the point is a valid one: the concept of "receipt" in today's world can be very difficult to measure, whereas "dispatch" is a somewhat more concrete and easily measurable event.
 
 
 35
 Whether we choose a dispatch rule or a receipt rule the courts will be called on to litigate some disputes. Under a receipt rule, the number of disputes will probably be about the same as under a dispatch rule. But the types of disputes that a receipt rule will engender will be more complex, requiring the courts to engage in metaphysical determinations, whereas the disputes under a dispatch rule will involve the courts in the kind of reasonableness determinations that courts make every day. On balance, we conclude that a dispatch rule will be more effective in providing certainty than a receipt rule.
 
 
 36
 There are a number of other arguments militating in favor of a dispatch rule, and we have noted these in the margin.[15] In view of these considerations, but primarily because it will best serve the congressional policy of certainty, we will adopt the dispatch rule for demands made pursuant to section 546(c).
 
 VI. CONCLUSION
 
 37
 In summary, we conclude that Marin "received" the gasoline within the meaning of section 546(c) of the Bankruptcy Code on April 11th, when the common carrier pumped the gas into the storage facility of Marin's bailee, Cities. We also conclude that the state court suit filed by Montello against Marin, and the temporary restraining order issued by that court against Marin, both of which were served on Marin on April 20th and therefore were timely, cannot constitute a demand for reclamation within the meaning of section 546(c) because neither mention "reclamation." However, although we concede that the question is close, we adopt a dispatch rule for demands made pursuant to section 546(c), and because we do, we conclude that the telex sent by Montello on April 21, and received by Marin on April 22 constituted a timely demand for reclamation. Because the district court concluded otherwise, it never reached Cities' affirmative defense that it was a good faith purchaser for value of the gasoline. Consequently, we will reverse the district court's grant of summary judgment in favor of Marin and Cities and remand for further proceedings consistent with this opinion.[16]
 
 JAMES HUNTER, III, Circuit Judge, concurring:
 
 38
 I concur in the majority's conclusion that Montello's demand was effective upon its dispatch using a commercially reasonable form of communication, and I join the majority in ordering a remand to the district court for consideration of the good faith purchaser defense.
 
 
 39
 I also share the majority's perception that a desire to foster "commercial certainty" is the only element of Congressional intent that can be definitively gleaned from the legislative history of section 546(c). I am not as concerned as the majority, however, about potential problems with the meaning of "receipt" in particular cases. Rather, I am convinced that certainty and reasonable commercial practices can best be achieved by conditioning a seller's common law right of reclamation upon the dispatch of a demand notice within ten days. The alternative rule would subject sellers, already constrained by the ten-day timeliness requirement, to the vagaries and uncertainties of the various modes of communication available to a commercially reasonable businessperson. Section 546(c) should be interpreted to protect the seller that satisfies its two-fold duty of selecting a commercially reasonable form of communication and transmitting a clear reclamation demand "before ten days after receipt of such goods by the debtor[.]"
 
 
 40
 Accordingly, I concur in the majority's decision.
 
 
 
 *
 Honorable Marvin Katz, United States District Judge for the Eastern District of Pennsylvania sitting by designation
 
 
 [1]
 The parties dispute whether Marin was insolvent when it received the gasoline. This factual issue is material under both section 546(c) of the Bankruptcy Code and section 2-702(2) of the U.C.C. Since we are reviewing an appeal from the district court's grant of summary judgment in favor of Marin, we must assume that Marin was insolvent at the time of receipt
 
 
 [2]
 The fact of service was disputed by Marin, but, for the purpose of reviewing the district court's grant of summary judgment we must assume that service occurred
 
 
 [3]
 Section 546(c) provides in relevant part:
 (c) The rights and powers of the trustee under section 544(a), 545, 547, and 549 of this title are subject to any statutory right or commonlaw right of a seller, in the ordinary course of such seller's business, of goods to the debtor to reclaim such goods if the debtor has received such goods while insolvent, but--
 (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; ....
 
 
 [4]
 Section 2-702(2) states in pertinent part:
 (2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply....
 
 
 [5]
 Section 546(c) does not include the second half of section 2-702(2) which provides that the ten-day limitation does not apply where the buyer makes a written misrepresentation of solvency to the seller within three months prior to delivery
 
 
 [6]
 The complaint and injunction were served on Marin on April 20th. Thus, regardless of whether Marin "received" the gasoline on the 10th or 11th, the complaint and injunction were served within the ten-day period provided by section 546(c) and therefore, if they constituted a valid demand, that demand was timely made
 
 
 [7]
 Montello emphasizes that it orally demanded reclamation on April 16th. Assuming this assertion is true, it is irrelevant. Section 546(c) requires a written demand
 
 
 [8]
 Accord In Re Helms Veneer Corp., 287 F.Supp. 840, 844 (W.D.Va.1968) (simply demanding payment for goods did not constitute a written demand for reclamation); cf. In Re Alla-Ohio Valley Coals, Inc., 22 Bankr. 336, 340 (Bankr.D.D.Colo.1982) ("the timely filing of a legal pleading, which is reasonably susceptible to conveying the seller's intention [to demand reclamation] would comply with the Code's demand of a demand in writing")
 
 
 [9]
 Our reliance on the Uniform Commercial Code for determining the time of receipt does not mean that the definition of receipt under section 546(c) is a matter of state law and might change were an individual state to alter its version of the Uniform Commercial Code. See Jerome v. United States, 318 U.S. 101 [63 S.Ct. 483, 87 L.Ed. 640] (1943) (presumption is that Congress, when it enacts a statute, is not making the application of the federal act dependent on state law). Rather, the Uniform Commercial Code assumes relevance in this regard because, in adopting section 546(c), Congress essentially borrowed from the U.C.C. Thus, we assume that Congress also borrowed the standard definition of receipt contained in the U.C.C
 
 
 [10]
 U.C.C. Sec. 2-705 provides:
 (1) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent (Section 2-702)....
 (2) As against such buyer the seller may stop delivery until
 (a) receipt of the goods by the buyer; or
 (b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or
 (c) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman; or
 (d) negotiation to the buyer of any negotiable document of title covering the goods.
 See Official Code Comment to Sec. 2-705 ("As between the buyer and the seller, the latter's right to stop the goods at any time until they reach the place of final delivery is recognized by this section"); R. Anderson, Uniform Commercial Code Sec. 2-705:1 (3d ed. 1983).
 
 
 [11]
 These rights, therefore, appear to be complementary; the right to stop goods applies while they are in the possession of the carrier, the right of reclamation applies once the goods have been received. The wording of U.C.C. 2-702(2)--"demand made within ten days after the receipt"--would indicate that the demand must be made within the window between the time of receipt and ten days thereafter. A conspicuous language change in section 546(c) of the bankruptcy code--"demands in writing reclamation of such goods before 10 days after receipt"--indicates that, at least in the context of a bankruptcy, a demand for reclamation made anytime before ten days after receipt of the goods is sufficient. Thus a demand could be made even before receipt. See, e.g., In Re Alla-Ohio Valley Coals, Inc., 22 Bankr. 336, 339 (Bankr.D.D.Colo.1982) (written demand for reclamation made 5 days before receipt of goods by buyer/debtor--i.e., while they were in transit--is sufficient under section 546(c))
 
 
 [12]
 Marin emphasizes the fact that Montello did not know the destination of the gasoline once it was loaded on the common carrier, and therefore, because Montello did not know where the common carrier was, it could not have exercised its right under section 2-705 to stop delivery. This problem was considered and determined to be irrelevant by the drafters of the U.C.C. in the Official Code Comment to section 2-705:
 Under subsection (3)(c) and (d), the carrier is under no duty to recognize the stop order of a person who is a stranger to the carrier's contract. But the seller's right as against the buyer to stop delivery remains, whether or not the carrier is obligated to recognize the stop order. If the carrier does obey it, the buyer cannot complain merely because of that circumstance; and the seller becomes obligated under subsection (3)(b) to pay the carrier any ensuing damages or charges.
 
 
 [13]
 Marin argues that if we hold that it did not "receive" the gasoline when the gas was loaded onto the common carrier's barge, based on the theory that Marin did not have "physical possession," then we can not, consistent with that conclusion, hold that Marin "received" the gas when it was pumped from the barge into Cities' storage tanks. It is true that 2-702(2) says "receipt" and that 2-103(1)(c) defines receipt as "physical possession." But the preface to 2-103 states: "[t]he following words and phrases when used in this article shall have, unless the context clearly indicates otherwise, the meaning given them in this subsection." Section 2-705(2) lists three instances of constructive receipt by the buyer that end the seller's right to stop delivery. Receipt by a bailee, who acknowledges to the buyer that it holds the goods for the buyer, is such an exception, U.C.C. Sec. 2-705(2)(b). Since 2-702(2)--the right of reclamation--comes into effect once the right to stop delivery under 2-705 ends, see Ceres Inc. v. ACLI Metal & Ore Co., 451 F.Supp. 921, 924, 24 U.C.C. 140, 144 (N.D.Ill.1978), we believe the list of constructive receipt situations contained in section 2-705 must also apply to the question of receipt under section 2-702. See id. The barge common-carrier in this case does not fit under any of the constructive receipt provisions contained in 2-705, but Cities appears to fit comfortably within 2-705(2)(b), because it is a bailee that, by virtue of the terminalling agreement, has acknowledged to Marin that it holds the gasoline for Marin's benefit. We thus believe that it is entirely consistent to conclude that there was no receipt by Marin when the gasoline was placed on the common carrier, but that there was receipt by Marin when Cities took delivery from the common carrier
 In any event, proving that it did not "receive" the gasoline on April 11th does not help Marin's case. If Marin did not receive the gasoline when Cities obtained physical possession from the common carrier, then the ten-day limitations period contained in section 546(c) did not begin to run on April 11th. And since, under section 546(c), a demand is timely even if sent prior to "receipt" of the goods, see supra note 11, Montello's telex demand would have been timely, regardless of whether we were to adopt a receipt or dispatch rule. Hence, if Marin is correct on this argument, it loses the case.
 
 
 [14]
 Nor is "demand" defined in the Uniform Commercial Code
 
 
 [15]
 Since Congress used the word "demand" and did not define it in the statute, normally we would give the word its ordinary dictionary meaning. The dictionary defines "demand" as "to ask for by right or authority; claim as something due; require of others." This definition focuses on the maker and not the receiver of the demand. Thus, by simply giving the statutory language of section 546(c) its ordinary meaning, it appears that the demand should be effective on dispatch. Moreover, the drafters of section 546(c) knew how to say receipt when they meant receipt. For instance, the written demand for reclamation required by section 546(c) must be made "before ten days after receipt of such goods by the debtor." Therefore, Congress must have meant something other than receipt when it provided that "a seller may not reclaim any such goods unless such seller demands in writing reclamation."
 
 
 [16]
 The parties appear to suggest that we should decide the good faith purchaser issue as a matter of law based on the record before us. We perceive, however, several disputed factual issues which may bear on the good faith purchaser characterization, and therefore we believe resolution of this issue is best left to the district court on remand