800 F.2d 469
 2 UCC Rep.Serv.2d 159
 In the Matter of BRIO PETROLEUM, INC., Debtor.
ABILENE NATIONAL BANK, a/k/a MBank Abilene, N.A., Defendant-Appellant,
v.
FINA SUPPLY, INC., a/k/a Fina Oil and Chemical Company,
Plaintiff-Appellee.
 No. 85-1761.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 19, 1986.
 
 Jeff Joyce, W. Mike Baggett, Dallas, Tex., for Abilene Nat. Bank.
 Robert J. Clary, Dallas, Tex., for Fina Supply, Inc.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, RUBIN and GARZA, Circuit Judges.
 GARZA, Circuit Judge:
 
 BACKGROUND
 
 1
 This case involves the relationship of two petroleum exchange agreements made by Brio Petroleum, Inc. ("Brio") and two other oil companies, Ashland Sub 26, Inc. a/k/a Scurlock Oil Company ("Scurlock") and Fina Supply, Inc. a/k/a Fina Oil and Chemical Company ("Fina"). One agreement, between Brio and Fina (the "Fina Exchange"), dated April 24, 1981, provided for the daily exchange of 5,000 barrels of Giddings type crude oil. Brio agreed to deliver its oil to the "Getty Pipeline, Cushing Station" and to pay Fina a $.25 per barrel differential. Fina agreed to deliver its oil to three different locations, one of which was the Rosanky Station on the Tex-New Mex Pipeline.
 
 
 2
 Apparently, to discharge its obligations under the Fina Exchange, Fina contracted with Mesa Pipeline Company ("Mesa") to purchase oil from Mesa's tanks at the Rosanky Station. Mesa owned tank facilities at this station which were connected by pipeline to Scurlock's tanks. Scurlock, in turn, owned the only injection facility into the Tex-New Mex Pipeline. Under the terms of the Fina/Mesa contract both title and risk of loss for the oil passed to Fina at the "outlet flange" of Mesa's tank. Thus, as the oil from Mesa's tanks flowed into Scurlock's tanks, the burden of any loss fell to Fina until the oil was "delivered" to Brio under the Fina Exchange at the "Tex-New Mex Rosanky". Scurlock charged Mesa $.20 per barrel on all barrels that moved through its facility and Mesa, in turn, passed this "thru put" charge back to Fina.
 
 
 3
 Unknown to Fina, another agreement, between Brio and Scurlock (the "Scurlock Exchange"), dated April 25, 1980, provided for the daily exchange of 1,000 barrels of Giddings type crude oil. Under the terms of the Scurlock Exchange, Brio would make its deliveries "into Scurlock's Rosanky tankage" and Scurlock would make its deliveries to Brio into the Exxon Pipeline at Hearne, Texas. The Scurlock Exchange also provided that Scurlock would receive, as a "location differential," $.20 per barrel.
 
 
 4
 Brio also owned a tank at the Rosanky Station, which, like Mesa's tank, was connected by pipeline to Scurlock's tank. Some of the deliveries of oil from Brio to Scurlock under the Scurlock Exchange were made from Brio's tank at Rosanky. Unknown to Fina, however, Brio also designated the oil it purchased from Fina under the Fina Exchange and the subsidiary Fine/Mesa agreement as a "delivery" of oil to Scurlock from Brio under the Scurlock Exchange. Accordingly, Scurlock would credit Brio with a "delivery" under the Scurlock Exchange each time Fina Oil passed from Mesa's tank into Scurlock's tank. Unaware of the Scurlock Exchange, Fina believed that it was being credited for this oil in accordance with the terms of the Fina Exchange.
 
 
 5
 On June 2, 1982, Fina filed a lawsuit in state district court against Brio. It also filed a prejudgment garnishment action against Scurlock and Exxon Pipeline Company. In response to the garnishment action, Scurlock admitted that it was obligated to deliver about 42,000 barrels of crude oil to Brio. On June 11, 1982, Abilene National Bank a/k/a MBank Abilene ("ANB") intervened in Fina's garnishment action as a secured creditor with an interest in Brio's inventory and accounts receivable. On the same date, Brio filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code.
 
 
 6
 On July 7, 1982, Fina filed an adversary proceeding against Brio in the United States Bankruptcy Court for the Northern District of Texas requesting relief from the automatic stay and claiming that it had stopped in transit, pursuant to Section 2.705 of the Uniform Commercial Code ("Code"), V.T.C.A. Bus. & C. Sec. 2.705 ("Section 2.705"), about 42,000 barrels of crude oil that was the subject of the state court prejudgment garnishment action. Fina subsequently amended its complaint alleging that 24,029 barrels of oil were actually stopped in transit.
 
 
 7
 Although Brio was a Chapter 11 debtor in possession at the time Fina commenced its Section 2.705 action, the bankruptcy court subsequently placed Brio in a Chapter 7 liquidation posture pursuant to an order of the court. A trustee was appointed on Brio's behalf. ANB announced that since its interests were directly aligned with Brio's in regard to the Section 2.705 claim, it would not participate in the trial of the case. Thereafter, counsel for Brio, in effect, presented the case on behalf of Brio, the Trustee and ANB.
 
 
 8
 At the conclusion of the trial on the adversary proceeding, the Bankruptcy Referee filed a Memorandum under Bankruptcy Rule 752 ("Rule 752 Memorandum") holding in favor of Fina on the Section 2.705 claim. After entry of judgment in the bankruptcy court, the trustee, Brio and ANB appealed to the United States District Court for the Northern District of Texas. The Honorable Robert W. Porter adopted the Findings of Fact and Conclusions of Law of the bankruptcy court. Judgment was entered accordingly and ANB now appeals. Finding no legal or factual error, we affirm.
 
 DISCUSSION
 I.
 Section 2.705 provides:
 
 9
 Seller's Stoppage of Delivery in Transit or Otherwise
 
 
 10
 (a) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent (Section 2.702) and may stop delivery of carload, truckload, planeload or larger shipments of express or freight when the buyer repudiates or fails to make a payment due before delivery or if for any other reason the seller has a right to withhold or reclaim the goods.
 
 
 11
 (b) As against such buyer the seller may stop delivery until
 
 
 12
 (1) receipt of the goods by the buyer; or
 
 
 13
 (2) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or
 
 
 14
 (3) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman; or
 
 
 15
 (4) negotiation to the buyer of any negotiable document of title covering the goods....
 
 
 16
 The bankruptcy court found that, as of May 28, 1982, (1) the 24,029 barrels of oil in question were inside Scurlock's Rosanky tankage, and had not been placed in the Tex-New Mex Pipeline, (2) Fina had sent proper notice to Scurlock stopping any crude oil in transit, (3) the oil in question was being exchanged by Fina pursuant to the Fina Exchange, and (4) Brio was "insolvent" within the meaning of Section 2.705. ANB does not take issue with the court's foregoing findings and conclusions. On appeal, ANB challenges only the court's conclusion that the oil "was in transit at the time Fina sent its notice."[1] According to ANB, an examination of the Fina Exchange reveals that Scurlock's tankage at Rosanky, not the Tex-New Mex Pipeline, constituted the point of initial and final delivery of the oil to Brio. ANB then concludes that once the oil entered the pipeline segment connecting Mesa's tankage facility to Scurlock's, Fina's right of stoppage terminated.
 
 
 17
 Section 2.705(b) specifies the four "events" that terminate the seller's right to stop goods in transit. The seller's right continues until: (1) the buyer receives the goods, (2) a bailee other than a carrier acknowledges to the buyer that the bailee is holding the goods for the buyer; (3) a carrier makes such acknowledgment to the buyer by reshipment or as a warehouseman; or (4) a negotiable document of title has been negotiated to the buyer. See Nordstrom, Law of Sales, Sec. 164, p. 496 (West Pub. Co. 1981). Save the occurrence of one of the last three events, which serve in large part to protect a bailee or carrier, termination of the seller's right of stoppage occurs only upon "receipt" of the goods by the buyer.
 
 
 18
 Section 2.103 defines "Receipt" of goods as "taking physical possession of them." Official Comment 2 distinguishes receipt from delivery, "since the seller may frequently fulfill his obligations to 'deliver' even though the buyer may never 'receive' the goods." Thus, the Code makes clear that a seller's right to stop goods in transit may continue after delivery and until the buyer is in actual, physical or constructive possession of them. See Matter of Marin Motor Oil, Inc., 740 F.2d 220, 224-26 (3rd Cir.1984); In re Murdock Machine & Engine Co. of Utah, 620 F.2d 767, 773 (10th Cir.1980); Amoco Pipeline Co. v. Admiral Crude Oil Corp., 490 F.2d 114, 117 (10th Cir.1974); In re Maloney Enterprises, Inc., 37 B.R. 290, 294 (E.D.Ky.1983). It follows that Fina's delivery to Scurlock, vis-a-vis the pipeline segment connecting Mesa's and Scurlock's tank facilities, did not terminate Fina's right of stoppage.
 
 
 19
 ANB contends, nonetheless, that the buyer, Brio, never actually took physical possession or "received" oil pursuant to the Fina Exchange, and that, therefore, "final delivery" of the oil under the agreement constituted receipt, constructive or otherwise, by Brio. ANB argues, moreover, that the bankruptcy court's implicit conclusion that the Tex-New Mex Pipeline was the point at which the oil was received or finally delivered is an erroneous construction of the Fina Exchange. We cannot agree.
 
 
 20
 While not entirely unambiguous, the language of the Fina Exchange does not support a construction of the agreement giving Brio physical or constructive possession of Fina's Oil prior to the Tex-New Mex Pipeline. The exchange agreement states
 
 FINA DELIVERIES
 
 21
 * * *
 
 
 22
 * * *
 
 6. SOURCE/DESTINATION
 SHELL-HOPE
 EXXON-RACCOON BEND
 TEX-NEW MEX--ROSANKY
 
 23
 TITLE TO TRANSFER AT MESA P/L'S DELIVERY POINT TO P/L OR P/L INJECTION FACILITY
 
 
 24
 The quoted language merely provides that legal title was to pass at Mesa Pipeline's delivery point to pipeline or pipeline injection facility. However, passage of legal title does not affect the seller's right of stoppage in transit. See e.g., Marin Motor Oil, 740 F.2d at 225 (the "right to stop delivery applies regardless of which party is deemed to have 'title' to the goods"); Murdock Machine, 620 F.2d at 773 ("who has 'title' to the goods is a matter of no relevance whatsoever"). In addition, Fina's "Manager of Crude Oil and Raw Material Supply" and negotiator in the Fina Exchange, Scott McEwen, testified that delivery to Brio under the agreement occurred when the oil was placed in the Tex-New Mex Pipeline. Based on the foregoing, we affirm the conclusion reached by both courts below that the oil in question had not been "received" by Brio.
 
 II.
 
 25
 On appeal, ANB has not argued that Scurlock was a bailee, or that a negotiable document of title covering the oil had been negotiated to Brio, and has expressly rejected characterizing Scurlock as a carrier. Consequently, none of the last three events contemplated in Section 2.705(b), by ANB's own acknowledgment, arose to terminate Fina's right of stoppage. Notwithstanding the conclusion that oil delivered under the Fina Exchange was not received by Brio until placed in the Tex-New Mex Pipeline, however, ANB maintains that Brio "received" Fina's oil within the meaning of Section 2.705(b)(1). According to ANB, Scurlock acted as Brio's subpurchaser in receiving Fina's oil under the terms of the Scurlock Exchange.
 
 
 26
 Official Comment 2 to Section 2.705 states:
 
 
 27
 "Receipt by the buyer" includes receipt by the buyer's designated representative, the sub-purchaser, when shipment is made direct to him and the buyer himself never receives the goods. It is entirely proper under this Article that the seller, by making such direct shipment to the subpurchaser, be regarded as acquiescing in the latter's purchase and as thus barred from stoppage of the goods as against him.
 
 
 28
 ANB contends that the bankruptcy court's conclusion "that the Scurlock Exchange was nothing more than a transportation arrangement," and thus, its implicit conclusion that Scurlock was not a subpurchaser is in error.
 
 
 29
 We agree that language in the Scurlock Exchange indicates that it is a "buy-sell" agreement.[2] Nonetheless, evidence adduced at trial below supports the bankruptcy court's conclusion that, in fact, Brio and Scurlock treated the agreement as a transportation arrangement. Testimony established that the actual operating pattern of Brio and Scurlock was to have Scurlock, from time to time, make deliveries of oil into the Tex-New Mex Pipeline rather than to the Hearne Exxon Pipeline, as contemplated in the Scurlock Exchange. This allowed Brio to move oil into two separate pipelines as needed. Moreover, Scurlock's "Assistant Manager of Trading and Scheduling," Craig Fisher, testified that Scurlock's sole motive in entering into the Scurlock Exchange was to profit from the $.20 per barrel location differential, which Fina, not Brio, ultimately paid. Therefore, although the Scurlock Exchange is in form a buy-sell agreement, in substance it is an agreement to transport oil.
 
 
 30
 However, even if the Scurlock Exchange is deemed a buy-sell agreement, as ANB contends, Scurlock cannot be characterized as a subpurchaser for purposes of Section 2.705(b). Official Comment 2 contemplates the seller's "acquiescence" in the subpurchaser's purchase, and therefore, the seller's knowledge of the subpurchase agreement. Murdock Machine, 620 F.2d at 775. Because the record establishes that Fina was unaware of the Scurlock Exchange, Scurlock cannot be deemed a subpurchaser.[3]
 
 CONCLUSION
 
 31
 Based on our review of the record and the foregoing discussion, we conclude that the 24,029 barrels of Fina Oil held in Scurlock's Rosanky tankage on May 28, 1982, was in transit as the courts below found. Accordingly, we Affirm the Judgment of the district court.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Fina urges this court to summarily affirm the final judgment of the district court on the ground that ANB did not participate in the trial before the bankruptcy court or in the district court proceedings, and therefore, failed to raise any of the arguments now advanced. Cf. United States v. Jackson, 700 F.2d 181, 190 (5th Cir.), cert. denied, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983), ("absent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court"). However, because the interests of ANB were aligned with those of Brio, whose counsel presented the case for Brio, the trustee and ANB without objection from Fina, we will review those issues, but only those issues, which were fairly raised in the courts below
 
 
 [2]
 The first paragraph of the "General Provisions" states:
 "As soon as possible after the close of each calendar month during which deliveries are made Seller shall invoice Buyer for the crude oil delivered. Settlement of oil purchased hereunder shall be made within five (5) days after the receipt of invoice. In the event the price of the oil sold hereunder is based on the average acquisition cost, Seller may render a provisional invoice with the understanding that a corrected invoice shall be submitted within a reasonable time thereafter. If the financial responsibility of Buyer becomes impaired or unsatisfactory to Seller, advance cash payment or satisfactory security shall be given by Buyer upon demand by Seller, and shipments hereunder may be withheld until such payment or security shall have been received by Seller." (emphasis added).
 
 
 [3]
 ANB argues that seller knowledge of the subpurchase agreement is irrelevant and cites Butts v. Glendale Plywood Co., 710 F.2d 504 (9th Cir.1983) in support of its position. Butts, however, involved reshipment by a carrier under Oregon's analogue to Section 2.705(b)(3), and in no way involved the situation contemplated in Official Comment 2