**In re TM CARLTON HOUSE PARTNERS, INC.**

**Civ. A. No. 90–0350.**

United States District Court,
E.D. Pennsylvania.

May 7, 1990.

Martin J. Weis, Dilworth Paxson Kalish & Kauffman, Philadelphia, Pa., for debtor.

Tom P. Monteverde, Jean C. Hemphill, Monteverde Hemphill Maschmeyer & Obert, Philadelphia, Pa., for claimant.

Mark J. Packel, Robert H. Levin, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Creditor's Committee.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

## MEMORANDUM

GILES, District Judge.

Appeal is taken by appellant Edward Cantor & Co., a real estate agency, from a final order of the bankruptcy court administering a Chapter 11 proceeding. 108 B.R. 512. Jurisdiction is founded upon 28 U.S.C. § 158.

## BACKGROUND

Appellant filed a proof of claim with the bankruptcy court in the amount of $497,-500, claiming that debtor owed it these funds pursuant to a broker fee arrangement. Specifically, appellant alleges that it introduced John Berg, President of First Philadelphia Corp., and Stephen Mullins, a general partner in General American Equities (GAE), debtor's general partner, and that this introduction resulted in the sale of Carlton House Associates, which owned The Carlton House, 1801–1845 John F. Kennedy Blvd., Philadelphia, PA. Debtor is a general partnership, consisting of

GAE, an Illinois General partnership, Stephen Mullins and Glenn Morris, which now owns the Carlton House property.

Mr. Berg and Edward Cantor, one of appellant's principals, proposed that Mr. Berg sell Mr. Mullins the Carlton House Associates partnership, which owned the Carlton House property, and appellant would receive a $500,000 commission. Debtor claims that the parties agreed that Mr. Berg would pay this fee. However, appellant states that the parties agreed that the payments were to come from GAE's prospective syndication, by granting appellant a 5% interest in the sale. GAE was purchasing Carlton House Associates intending to syndicate the deal by entering into a new partnership—the debtor—which would allow GAE to pay the purchase price for Carlton House by finding limited partners to invest in the deal. Debtor assumed the obligations of GAE with regard to the transaction. (Cooney Direct at 83).

The first, and apparently, the only meeting between Mr. Berg, Mr. Mullins and Mr. Cantor took place on March 7, 1984 at GAE's offices in Chicago. There, they discussed the price, terms and commission for the sale. Mr. Cantor testified that the appellant's commission payments would be made in installments from GAE's syndication. (Cantor Direct at 111). Additionally, he testified that both Mr. Mullins and Mr. Berg negotiated the commission amount with him. (*Id.*).

However, the seller of the property, Mr. Berg, testified that appellant's fee was computed as 5% of the net proceeds of the sale to Mr. Berg. (Berg Direct at 184). After that meeting, appellant had no further dealings with Mr. Berg or debtor, until its attempts to secure payment of its fee.

On the date of the transaction closing, Mr. Berg and debtor executed an escrow agreement providing that the excess funds of the investor note account would be used to pay obligations owed by Mr. Berg, such as the appellant's commission. The investor note account consisted of funds provided by debtor's limited partners. A few months after the closing, Mr. Berg sent appellant a consultation fee agreement which stated that he would pay appellant a fee equal to 5% of the funds contributed by debtor's limited partners. Appellant executed and returned the document to Mr. Berg.

Payments to appellant were to be made in installments. Philadelphia National Bank (PNB), the escrow trustee, made one payment to appellant in the amount of $51,-250. When it received no other payments, appellant turned to Mr. Berg for payment and then to debtor. Receiving no payments from them, appellant filed suit in state court against Mr. Berg and the debtor. The action was stayed when debtor filed for bankruptcy. Appellant subsequently filed a proof of claim against debtor's estate for the remaining amount of its fee due.

After a hearing on the issue, the bankruptcy court found that, Mr. Berg, as the seller, was solely responsible to pay appellant's claimed commission and, therefore, disallowed the claim. It relied on Mr. Berg's testimony and that of Thomas Cooney, who served as a consultant and later the chief operating officer of GAE. It also relied on the agreement of sale and the escrow agreement between Mr. Berg and GAE, and the consultation fee agreement between Mr. Berg and appellant. Moreover, the documents supported the testimony of Messrs. Berg and Cooney that no such obligation was created, according to the bankruptcy court.

In determining that no oral contract existed to pay appellant's fee, the bankruptcy court found that debtor and Mr. Berg spoke no words of contract. Additionally, the bankruptcy court found no evidence that Mr. Mullins, as GAE's general partner obligated the debtor to the terms of such a contract.

The agreement of sale specified that Middle States Realty Co. was the sole broker receiving commissions resulting from the sale. In the agreement, the seller and buyer represented that no other fees, including broker's or finder's fees, existed in connection with the sale.

Because Mr. Berg was the only obligor under the consultation fee agreement, the

agreement, on its face, demonstrated that he was solely liable for the fee payment. As the bankruptcy court pointed out, appellant had executed and returned the agreement to Mr. Berg. Since the consultation fee agreement created no liability on the debtor's part, the bankruptcy court found that the escrow agreement did not create debtor liability by simply referring to the consultation fee agreement.

Also rejected was appellant's alternative claim that it was, a third party beneficiary under any agreements between debtor and Mr. Berg. The bankruptcy court concluded that appellant had no right of action against debtor upon Mr. Berg's breach of contract.

Consequently, the issues on appeal are whether the bankruptcy court erred in finding 1) that no contract existed between appellant and debtor and 2) that appellant was not an intended third party beneficiary to the escrow agreement.

## LEGAL STANDARD

■ This appeal only presents questions of fact. Factual determinations by the bankruptcy court are unassailable by the reviewing district court, unless the findings are clearly erroneous. Fed.R.Civ.P. 52(a). *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 at 394, 68 S.Ct. 525 at 541, 92 L.Ed. 746 (1948). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 394, 68 S.Ct. at 541.

If the trial court's factual determination is supported by the record, then the district court must analyze the legal aspects of the findings to determine whether the findings were legally sufficient. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98 at 102 (3d Cir.1981) *citing Smith v. Harris*, 644 F.2d 985 at 990 n. 1 (3d Cir.1981) (Aldisert, J., concurring).

## FACTUAL ANALYSIS

■ The parties agree on all material facts, but disagree as to their implication. Appellant argues that the facts show that debtor agreed to pay it money. Debtor argues that the facts show that Mr. Berg agreed to pay appellant money. I conclude for the reasons that follow, that the bankruptcy court did not err in its findings.

Other than its assertion that Mr. Mullins participated in the negotiation of appellant's fee, appellant provides no statements in support of the existence of an oral contract with debtor. Appellant, therefore, provides no facts which suggest that the bankruptcy court erred in its finding that no oral contract existed. Nor did Mr. Mullins' participation in finder's fee negotiations between Mr. Berg and Mr. Cantor create an oral contract obligating Carlton House Associates or GAE to pay appellant's fee.

GAE purchased the Carlton House Associates partnership from Mr. Berg. Debtor became the ultimate purchaser of Carlton House Associates, assuming GAE's obligations. (Cooney Direct at 83). However, neither Carlton House Associates nor GAE was party to a written agreement obligating the entity to pay finder's fees to appellant.

The escrow agreement, according to appellant, evidenced the oral agreement and constitutes a written contract by which debtor obligates itself to pay a fee to appellant. Paragraph K of the escrow agreement provides, in pertinent part:

Berg and Edward Cantor Company, Inc., ("Cantor") ... have entered into a consulting agreement with respect to the Property (the "Cantor Agreement") pursuant to which Berg has agreed to pay certain consulting fees to Cantor."

This paragraph plainly states that Mr. Berg undertook the obligation to pay appellant a fee. Therefore, this agreement did not create a contractual obligation on debtor's part.

Arguing that the escrow agreement, as well as the consultation fee agreement, obligated both the debtor and Mr. Berg, appellant relies on the structure of the escrow agreement in support of its position. The escrow agreement provides that funds in excess of the debt service would be

disbursed in payment of other obligations recognized in the agreement. Mr. Berg's obligation to appellant was one such obligation. However, to create debtor liability, the escrow agreement would have to provide that for consideration the debtor was responsible to pay the fee. Here, the debtor, only agreed to pay the purchase price to Mr. Berg in installments as funds from the property and investors entering the escrow account. On the other hand, Mr. Berg provided for the direct payment of his obligations by the escrow trustee from funds deposited in the investor note account.

Mr. Cooney testified that he understood the escrow agreement to mean that the limited partners would pay money into the escrow account and that cash flow from the properties would be deposited into the account as well. The escrow agent would first use the funds to pay off the debt service. If money remained in the investor note account, funded by the limited partners, it would be paid to Mr. Berg, who would, in turn, disburse it in satisfaction of his obligations. (Cooney Direct at 71–2 and Cross Examination at 94). Therefore, the investor note account represented money for payment of the sale price to the seller, and not money for the payment of the debtor's fees owed appellant. In other words, Mr. Berg would have the escrow trustee pay his debts from the funds he would receive from the purchase.

The only brokerage fee contemplated by the agreement of sale was that of Middle States Realty Co. It stated, in pertinent part:

Seller agrees to pay a real estate sales commission to Middle States Realty Co. in accordance with the Broker Agreement.... Each of the parties represents and warrants to the other that it has not incurred and will not incur any other liability for finder's or brokerage fees or commissions in connection with this agreement. It is agreed that if any claims for finder's or brokerage fees or commissions are ever made against seller or Purchaser in connection with this transaction, all such claims shall be handled and paid by the party (the "Committing Party") whose actions or alleged commitments form the basis of such claim.

Thus, the agreement of sale specifically addressed the obligations of the parties if an entity other than Middle States Realty Co. claimed fees in connection with finding or brokering the transaction. Accordingly, it does not support appellant's claim against debtor.

Mr. Berg admits that he was obligated to pay appellant a commission under the consultation fee agreement on the underlying transaction. (*Id.* at 182, 208). It provides, in pertinent part:

Seller shall pay consultant a fee (the "fee") equal to 5% of the funds contributed by the limited partners of the partnership and paid to the wrap mortgagee in the form of semi-annual payments or mortgage service fees, net of amounts owned by seller in the amount of $2,700,000, under a Broker's Fee Agreement ... by and between Middle States Realty Company ... and Seller.

Therefore, the commission to Middle States Realty was an acquisition fee that Mr. Berg was obligated to pay. (*Id.* at 183). Mr. Berg stated that the 5% commission fee owed to appellant represented the 5% net proceeds that he was supposed to receive on the transaction after paying brokerage fees to Middle States. He agreed the amount was reasonable and that he did not mind paying it. (*Id.* at 184).

He stopped paying the commission because debtor defaulted on the purchase money financing instrument. (*Id.* at 185). The consultation fee agreement states, in pertinent part:

If purchaser defaults under the Purchase Agreement or any financing provided by Seller incident, thereto, all of Seller's obligations under this Agreement shall be terminated, subject to reinstatement in the event that Purchaser cures its default, in which event any payments that would have been due under this Agreement during the period of such default shall be paid by Seller to Consultant.

While this clause may demonstrate that Mr. Berg, as the seller, conditioned his

liability to his obligees on the performance of the debtor, nowhere in the document is it even suggested that debtor became jointly liable for the fees. The agreement merely shows that Mr. Berg expected to obtain the money needed to pay the fees from the sale proceeds and that he sought to protect himself from the continued obligation to pay if his income from the sale stopped.

The consultation fee agreement was between appellant and Mr. Berg, only. No one else was signatory to the agreement. Debtor was tangentially mentioned in paragraph 3; to wit, that Mr. Berg's obligations thereunder would be terminated should the debtor default under the agreement of sale.

Mr. Cantor testified that he signed the consultation fee agreement in order that appellant could be paid. (Cantor, Cross at 25). It was unimportant to him whether the seller or the buyer paid the fee. (*Id.* at 24).

Appellant offers letters from Mr. Mullins (Cantor Exh.s 21 and 32) that it suggests demonstrate that Mr. Mullins acknowledged debtor's liability to appellants. However, the letters show only that debtor intended to cure its default by January 1986 so that Mr. Berg would no longer be able to refuse to make the commission payments under paragraph 3 of the consultation fee agreement.

Mr. Cantor testified that Mr. Mullins, prior to the underlying transaction, advised him that Mr. Berg, Mr. Mullins and appellant should enter into a compensation agreement for future deals. (Cantor Direct at 107-8). However, he has not presented sufficient evidence to demonstrate that the bankruptcy court's finding that the parties had not entered into such an agreement was clearly erroneous.

Crediting Mr. Berg's testimony, the bankruptcy court found for debtor. Because the documents support Mr. Berg's testimony, this court finds the bankruptcy court's ruling supported by the record.

### THE ESCROW AGREEMENT

■ Appellant's only remaining argument is that it was a third party beneficiary to the escrow agreement. Appellant does not argue that the bankruptcy court stated incorrectly the law on third party beneficiary status. Rather, appellant argues that the bankruptcy court incorrectly applied the law as stated.

The bankruptcy court held that in order for a party to be a third party beneficiary of a promise, a promisor must have undertaken a performance which will have benefitted the noncontracting party. It found that no contract existed that was intended to benefit the appellant. Alternatively, it found that if the parties had entered into a contract benefitting the appellant, the appellant would have had to show that the parties made promises on the appellant's behalf. Finding that appellant had failed to make this showing, the bankruptcy court stated that the purchase and escrow agreements only constituted additional promises to appellant in furtherance of the terms of the consultation fee agreement between Mr. Berg and the appellant.

■ Appellant argues that both debtor and Mr. Berg intended that appellant be a third party beneficiary to the escrow agreement. *See Spires v. Hanover Insurance Co.*, 364 Pa. 52, 70 A.2d 828 (1950), *overruled in part*, 501 Pa. 47, 459 A.2d 744 (1983). However, the evidence is clearly contrary. Mr. Berg acknowledged his intent and obligation to pay the fee. The intent of the parties at the time they enter an agreement controls. Such intent must be determined from the written agreement itself if no ambiguities exist. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979). The purchase and escrow agreements are unambiguous. Additionally, the signatories to the agreement have testified that they intended for Mr. Berg to be solely liable for appellant's fee. This testimony is supported by the language of paragraph 19 of the agreement of sale.

Accordingly, the order of the bankruptcy court dated December 15, 1989 is affirmed.