In re MAYER POLLOCK STEEL
CORPORATION, Debtor.

MAYER POLLOCK STEEL
CORPORATION,
Plaintiff

and

Continental Bank the Official Committee
of Unsecured Creditors, and Lukens
Steel Company, Intervening Plaintiffs,

v.

LONDON SALVAGE & TRADING CO.,
LTD., Victor Steel and Supply Compa-
ny, Tyler Pipe Industries, Inc., Davis
Brothers Scrap Co. Inc., National Bear-
ings Company, USG Interiors, Inc.,
New Standard Corporation, Goodheart
Sons, Inc., and Svedala Industries, Inc.,
Defendants.

Bankruptcy No. 93–11975S.
Adv. No. 93–0408S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 18, 1993.

Anna Hom, Fellheimer, Eichen, & Braverman, P.C., Philadelphia, PA, for debtor.

Gretchen M. Santamour, Lesser & Kaplin, P.C., Blue Bell, PA, for Continental Bank.

W. Jeffrey Garson, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for Creditors' Committee.

Michael Reed, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Lukens Steel Co.

Leonard P. Goldberger, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for London Salvage & Trading Co., Ltd.

John Wetzel, Swartz, Campbell & Detweiler, Philadelphia, PA, for Victor Steel and Supply Co.

Steven J. Adams, Reading, PA, for Hoffmann Industries, Inc.

Barry A. Solodky, Lancaster, PA, for Goodhart Sons, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

LONDON SALVAGE & TRADING CO., LTD. ("London"), one of two intermediary brokers in a certain contractual arrangement for sale of scrap steel, attempts to claim rights of reclamation and/or rights as an administrative claimant against the Debtor, MAYER POLLOCK STEEL CORPORATION ("the Debtor"), the other intermediary broker. London also seeks to compel the Debtor to reject their allegedly executory brokerage Contract ("the Contract") and relief from the automatic stay to terminate the Contract.

In light of specific flaws in each of the requests for relief by London and in support of the general principle that a party seeking preferential treatment of its claims bears a heavy burden, we deny all of the relief sought by London. As to its reclamation claim, we find that London failed principally to carry its burden of proving that the Debtor ever had the requisite actual, physical possession of the scrap steel. As to its administrative claim, we find that London's administrative status is precluded by the completion of London's deliveries of the scrap to a common carrier pre-petition. We also find that a post-petition arrangement between the Debtor and its customer, LUKENS STEEL CO. ("Lukens"), which assures direct payment to London less the Debtor's commission, eliminates the urgent need for the Debtor's immediate decision to assume or reject its contract with London and London's need to invoke state-law remedies to protect its interests.

## B. PROCEDURAL AND FACTUAL HISTORY

As the stamp on the petition and the certification of the Debtor's counsel establish, the Debtor filed its voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code on Saturday, April 3, 1993. We specifically find that the April 2, 1993, date appearing on the docket is in error.

In reviewing the history of the main case from a broad perspective, we note that, since the outset of this case, there has been an unusually bitter and prolonged struggle between the Debtor and its principal secured creditor, CONTINENTAL BANK ("the Bank"), over the terms of periodic cash collateral orders. An active Official Unsecured Creditors' Committee ("the Committee") has participated in all but the first few of the cash collateral hearings. Presently, we are allowing the Debtor to operate within its proffered budget, but requiring it to make interest payments of about $25,000 monthly to the Bank as adequate protection payments. The Bank has requested additional payments of principal (about $25,000 *more* per month) as adequate protection in light of the Debtor's alleged inadequate post-petition performance. The Committee has contended that even the interest payments are not justified.

The last contested cash collateral hearing, on August 4, 1993, resulted in our continuing the *status quo* as described above until August 25, 1993, the date of a hearing on the Debtor's efforts to further extend its exclusivity period. The Bank and the Committee appear to be ready to join forces to terminate exclusivity. London has alleged that it and another creditor have prepared a plan which they intend to file themselves should exclusivity end. Therefore, by necessity, the Debtor may be compelled to promptly file and seek to achieve confirmation of a plan of reorganization.

The facts underlying this dispute, if not the legal ramifications of those facts, are largely undisputed.

The Debtor is and continues to be engaged in, principally, processing steel scrap and, secondarily, serving as a scrap steel broker. The instant transaction involves its secondary brokerage business, pursuant to which it acquired for Lukens, through London, a Canadian steel broker, access to a high quality scrap product manufactured in Canada by a customer of London known as "Accuride."

On December 1, 1991, the Debtor and London entered into a three-year contract ("the Contract") whereby all Accuride product sold to Lukens would be obtained through both the Debtor and London as co-brokers. Under the terms of the Contract, spread across several related documents phrased in rather informal terms, London was given the responsibility of loading the cars for delivery, and freight charges were to be paid by the Debtor. Testimony reflected that the Debtor realized about $7.65/ton gross profit, about $4.65/ton of which was expended on freight charges, under the Contract.

Mayer Pollock, II, the vice-president and treasurer of the Debtor, testified that the Debtor generally neither handled nor saw the Accuride scrap on its journey from Canada to Lukens' plant in Pennsylvania. He also testified that the Debtor's obligation to pay London for a shipment became unconditional only when the shipment was accepted by Lukens. If Lukens rejected a shipment, the Debtor would have no obligation to pay for that material, but, per Pollock, would usually resell it locally because it was not economically feasible to reship product to London in Canada.

Terry Kummer, the vice-president and co-owner of London, also testified, and described the Contract process on London's end as follows:

We pick the material at Accuride Canada in trailers and loader containers, weigh it before it leaves, we bring it to the yard [and] ... reweigh it. We load it directly into the rail cars. When they are loaded, we send a shipping notice, an invoice, and a CN [Canadian National Railways, the carrier] bill of lading ... we prepare the bill of lading per [the Debtor's] direction,

wherever they want it to go. When the [rail] cars are delivered, Lukens receive[s] them, weigh[s] them, check[s] them for quality ... they can just do a visual check when they're first received. Then they [Lukens] have to off-load them [the rail cars] ... to make sure its [the scrap Accuride] constant throughout the [rail] car. And at that time its [the Accuride scrap] theirs.

Kummer further stated that all that remained to finalize the transaction at that point was the preparation of an "adjusting invoice" prepared by Lukens and sent to the Debtor, and, in turn, to London, which indicated any difference in the weight of the shipment, or reflected any agreed-upon price adjustments.

No longstanding payment difficulties among the parties were related. Historically, Lukens paid the Debtor on a monthly basis and the Debtor apparently remitted payments to London shortly thereafter. However, the Debtor's slide into bankruptcy apparently caused it to become slow in remitting payments to London.

According to Kummer, the Debtor is presently indebted to London in the amount of $396,364.10. Particularly at issue are the five shipments of scrap which Lukens received after the April 3, 1993, which are reflected as follows:

| Date of Delivery to CN by London | Date of Delivery to Lukens | Balance Due |
|---|---|---|
| 3/25/93 | 4/08/83 | $10,866.54 |
| 3/25/93 | 4/08/93 | 10,693.80 |
| 3/26/93 | 4/08/93 | 11,210.79 |
| 3/29/93 | 4/12/93 | 11,232.84 |
| 3/29/93 | 4/08/93 | 10,979.25 |
| | TOTAL | $55,983.22 |

In early April, 1993, London sent two writings to the Debtor, both of which it contends constitute "demands" required by 13 Pa.C.S. § 2702(b). The first was handwritten and faxed, with only a list of numbers of the CN cars containing the respective shipments attached, on April 1, 1993, and reads as follows:

We hereby demand immediate return of all the above product with all freight costs associated with the return to our account.

Under Ontario law we are claiming ownership to and return of the scrap material in question. TOTALLING [sic] THE AMOUNT IN THE TWENTY CARS IN QUESTION IS 3,546,450 lbs.

The second, typed and mailed on April 6, 1993, with a list identifying the car number, date, and dollar amount of each shipment, reads as follows:

RE: *RECLAMATION GOODS PURSUANT TO 11 U.S.C. 546*

Mayer Pollack [sic]:

We have been advised of your bankruptcy filing. You currently have an outstanding balance with us for goods shipped prior to the filing of the bankruptcy petition. This letter addresses several of those invoices.

As set out in Schedule A attached hereto, you have received these goods within the last ten (10) days. Pursuant to 11 U.S.C. Section 546(c), demand is made for the return of the goods provided to you on these dates listed.

Any goods provided to you subsequent to the filing of your bankruptcy petition are entitled to administrative expense priority. We expect that obligations for these goods will be paid in accordance with the credit terms of the invoices.

London also abruptly ceased sending Accuride product to the Debtor on behalf of Lukens after March 29, 1993. The Debtor was, however, at this point owed in excess of $1 million by Lukens for Accuride scrap and other, smaller purchases and wished to

recover this sum. It also wished to retain its business relationship with Lukens. Lukens, on its part, also wished the relationship to continue, but was concerned that London and other brokerage customers of the Debtor would proceed against it for payment of product which it had already paid to the Debtor.

To resolve these problems, the Debtor and Lukens negotiated a Stipulation ("the Stipulation"), a motion for approval by this court of which was filed on April 28, 1993, and was ultimately served upon all interested parties. The principal terms of the Stipulation were that Lukens agreed to pay the Debtor $1,065,815.49 for Accuride scrap sold to it by the Debtor prior to the Debtor's bankruptcy filing. From this amount, Lukens agreed to escrow $265,538.00 on account of written reclamation demands made by suppliers. Lukens also agreed to pay the Debtor $145,162.27 immediately for scrap metal received by Lukens after the filing of the Debtor's bankruptcy petition. On its part, the Debtor agreed to hold Lukens harmless from any claim by a supplier of product for which Lukens had already sent payment to the Debtor. Finally, as to the parties' future dealings, Lukens agreed to pay any supplier from whom Lukens had purchased Accuride scrap directly and to additionally pay the Debtor a fee of $3.00/ton for product so purchased. Finally, Lukens was also permitted to make specific appropriate arrangements with the individual suppliers.

On May 20, 1993, following a hearing on May 12, 1993, we granted the Debtor's motion to approve this Stipulation with certain modifications, over mild objections of only London. The modifications increased the amount held by Lukens in escrow to $286,000, determined to be the upper range of the potential reclamation claims. The amount payable to the Debtor from Lukens on the date of entry of this Order was accordingly reduced to $379,176.74, from the stipulated amount of $400,638.75. In addition, the Stipulation required the Debtor to file, on or before May 17, 1993, an action to determine the identity of creditors holding reclamation demands with respect to the product shipped to Lukens, and its other brokerage customers, and the validities, amounts, and priorities of such claims. A hearing on the projected action was scheduled on June 23, 1993.

At trial, it was noted that Lukens and London had made arrangements subsequent to the Debtor's bankruptcy filing, in accordance with the Stipulation, whereby Lukens was to remit payments on a weekly basis, rather than monthly, to London. Also, from April 19, 1993, to the date of trial, it was noted that Lukens had paid London approximately $650,000 in American dollars for Accuride scrap. Therefore, London has apparently opted to retain a large and valuable business relationship with Lukens.

On May 17, 1993, the Debtor filed the Complaint in the proceeding before us per the Stipulation. On May 26, 1993, London filed the other matter before us, its Motion to Compel Rejection of Executory Contract; for Relief from Automatic Stay to Terminate Contract; and Request for Payment of Administrative Claim ("the Motion"), and requested that we list the Motion for a hearing with the adversary trial on June 23, 1993, which we did. The Bank, the Committee, and Lukens all were permitted, without opposition, to intervene as plaintiffs in the proceeding.

In the Motion, as supported by Kummer's testimony at the trial/hearing, London sought to have this court compel the Debtor to reject its contract with London. Its reasoning was based on Kummer's calculations that the Debtor could only project a $260,000 profit on the Contract as compared to about $400,000 in delinquencies under the contract, which it would have to pay London if the Contract were assumed.

In support of its prayer for relief from the automatic stay, London requested, in essence, the right to end the Contract because of the Debtor's inability to make full payment to it, or, in the alternative, for adequate protection that its delinquency would be paid.

As to its request for an administrative claim, London requested payment of at

least $55,000, approximately the amount of the balance due on the five shipments delivered to Lukens after April 3, 1993.

Prior to the consolidated trial/hearing on the proceeding and the Motion on June 23, 1993, we were advised by the Debtor that several of the Defendants had not filed responsive pleadings, justifying defaults as to them, and that it had negotiated settlements with all of the answering defendants except the largest claimant-Defendant, *i.e.*, London.

Also testifying at the trial/hearing, in addition to Pollock and Kummer, was Dennis Owens, the controller of the Debtor. Through him, London brought out the fact that the Debtor's Statement of Financial Affairs and Schedules and Owens' own testimony at the Meeting of Creditors, held on June 8, 1993, indicated that the Debtor had a substantial negative net worth on the date of filing and at all times thereafter. However, Owens contended that the Debtor's net worth, per the Schedules and his testimony at the Meeting of Creditors, was based upon the book value of the Debtor's assets, rather than the fair market value of the Debtor's property. Owens also contended, particularly as to the Debtor's real estate assets, that the fair market values were far in excess of the amounts stated on the Debtor's balance sheets.

Also entered into evidence at the June 23, 1993, hearing by the Bank were its mortgage and loan documents with the Debtor, evidencing the Bank's security interest in all "Accounts receivable, Equipment, Inventory, Contract rights, General Intangibles, Real Estate Mortgages or Notes, all of the foregoing whether now owned or hereafter acquired, and all cash and non-cash proceeds thereof and all proceeds of proceeds including insurance proceeds." It was also noted that the Bank's claim, being at least $2.5 million, was far in excess of the amount of London's purported total claim against the Debtor. The Bank hence claimed a security interest in the proceeds from Lukens and bona fide purchaser status which gave it a priority over any reclamation claims of London.

By post-trial Order of June 24, 1993, interested parties were accorded the opportunity to file Opening Briefs on or before July 23, 1993, and Reply Briefs on or before July 30, 1993. The Debtor, London, and the Bank each submitted Opening and Reply Briefs, and the Committee submitted a brief Reply only.

## C. *DISCUSSION*

### 1. LONDON HAS NOT ESTABLISHED ITS RIGHT TO RECLAMATION, MOST NOTABLY BECAUSE THE DEBTOR DID NOT HAVE POSSESSION OF THE GOODS IN ISSUE AT THE TIME OF DEMAND.

The only issue presented by the proceeding and the principal issue raised in the Motion is whether London has special reclamation rights against the Debtor. The Code section recognizing such rights, as a limitation on avoidance powers of a trustee or a debtor-in-possession, is 11 U.S.C. § 546(c), which provides as follows:

(c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under section 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—

(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and

(2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—

(A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or

(B) secures such claim by a lien.

The statutory right of a seller of goods to reclamation is set forth in the Pennsyl-

vania Uniform Commercial Code ("the UCC"), at 13 Pa.C.S. § 2702, as follows:

### § 2702. Remedies of seller on discovery of insolvency of buyer

**(a) Right to refuse or stop delivery.—** Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract and stop delivery under this division (section 2705).

**(b) Reclamation of goods on credit.—** Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

**(c) Limitations on right of reclamation.—** The right of the seller to reclaim under subsection (b) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this division (section 2403). Successful reclamation of goods excludes all other remedies with respect to them.

London's assertion of an administrative claim appears to arise, for the most part, from 11 U.S.C. § 546(c)(2)(A). Its rather weak alternative bases for asserting an administrative claim are addressed, with the issues of London's rights under 11 U.S.C. § 365(d)(2) (seeking to compel rejection of the contract); and 11 U.S.C. § 362(d) (seeking relief from the automatic stay), at pages 963–66 *infra*.

■ In order for a seller, such as London, to reclaim goods sold to an insolvent buyer, such as the Debtor, the seller must resort solely to the terms of 11 U.S.C. § 546(c) for relief. *See In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1346 (11th Cir.1988) ("Section 546(c) of the Bankruptcy Code provides the exclusive remedy for a seller who seeks to reclaim goods from a debtor in bankruptcy"); *In re MGS Marketing*, 111 B.R. 264, 267 (Bankr. 9th Cir. 1990) ("when an unpaid supplier has not complied with the conditions of 11 U.S.C. § 546 and UCC § 2–702, relief is unavailable in equity or under the common law because other remedies have been in effect preempted or supplanted by these statutes"); *In re Leeds Bldg. Products, Inc.*, 141 B.R. 265, 267 (Bankr.N.D.Ga.1992) (Section 546(c) "is the exclusive remedy of a seller who seeks to reclaim goods from a debtor"); *In re Rea Keech Buick, Inc.*, 139 B.R. 625, 628 (Bankr.D.Md.1992) ("The exclusive remedy for a seller to reclaim goods sold to an insolvent debtor is a complaint filed in the bankruptcy court pursuant to Section 546(c) of the Bankruptcy Code"); and *In re Dynamic Technologies Corp.*, 106 B.R. 994, 1004 (Bankr.D.Minn.1989) ("Section 546(c) is the exclusive remedy available to vendors who are attempting to reclaim their goods"). Moreover, a seller's reclamation is limited to reclamation of the goods, as opposed to recovery of proceeds received by the buyer from the goods. *See In re Coast Trading Co.*, 744 F.2d 686, 691 (9th Cir.1984); and *In re Diversified Food Service Distributors, Inc.*, 130 B.R. 427, 430 (Bankr.S.D.N.Y.1991).

■ In addition to establishing that it had a right to reclaim the goods under 13 Pa.C.S. § 2702, a seller seeking to effect reclamation must prove that the goods were sold to the debtor in the ordinary course of business, that the debtor was insolvent when the goods were delivered or received, that written demand for return of the goods was made within ten days after delivery or receipt, that the goods were identifiable at time of demand, and that the goods were in possession of the debtor at the time of demand. *See In re Continental Airlines, Inc.*, 125 B.R. 415, 417 (Bankr.D.Del.1991); and *In re Braniff*, 113 B.R. 745, 751 (Bankr.M.D.Fla.1990). The seller bears the burden of proving all of these elements. *See Rawson Food Service, supra*, 846 F.2d at 1347; *Leeds Bldg. Products, supra*, 141 B.R. at 267; and *Braniff, supra*, 113 B.R. at 751.

■ Insolvency must be proven by use of the "balance sheet" test. *In re Storage Technology Corp.,* 51 B.R. 206, 207 (D.Colo.1985); *Continental Airlines, supra,* 125 B.R. at 417; and *In re Best Buy Drugs, Inc.,* 89 B.R. 997, 998 (Bankr. S.D.Fla.1988). Unlike 13 Pa.C.S. § 2702, which makes an exception if the seller is unaware of the buyer's insolvency and which does not specify the form of the demand, § 546(c)(1) requires, without exception, that a *written* reclamation demand *must* be made within ten days of the debtor's possession of goods sought to be reclaimed. *See In re Marin Motor Oil Inc.,* 740 F.2d 220, 224 (3rd Cir.1984) ("the date of receipt is established by section 546(c) as the day from which to begin counting the ten-day period within which the seller must make a written demand for reclamation"); *Rea Keech Buick, supra,* 139 B.R. at 629; *In re Buyer's Club Market, Inc.,* 100 B.R. 35, 36 (Bankr.D.Colo.1989); and *In re Ateco Equipment, Inc.,* 18 B.R. 917, 919 (Bankr.W.D.Pa.1982).

■ However, the significant prerequisite for reclamation, in regards to London's instant claim, is the *receipt* of the goods by the buyer in his possession, as of the time of the demand. *Marin Oil,* the controlling precedent in this jurisdiction, clearly indicates that "receipt," for the purposes of § 546(c), must be actual, physical possession by the buyer, derived from the UCC's definition of "receipt." 740 F.2d at 224. The *Marin Oil* court's reliance on the UCC for the definition of "receipt"

> does not mean that the definition of receipt under section 546(c) is a matter of state law and might change were an individual state to alter its version of the Uniform Commercial Code ... Rather, the Uniform Commercial Code assumes relevance in this regard because, in adopting section 546(c), Congress essentially borrowed from the U.C.C. Thus, we assume that Congress also borrowed the standard definition of receipt contained in the U.C.C.

*Id.* at 225 n. 9.

It is true that a constructive receipt will satisfy the requirements for reclamation if

same is by way of possession of goods by a buyer's bailee, such that when the buyer's bailee receives possession of the goods to be reclaimed, the buyer may be deemed to be in constructive possession of the goods. *Id.* at 225. However, receipt of the goods by a common carrier is not deemed constructive possession by a buyer, but rather is deemed to be possession by the common carrier. *Id.* The *Marin Oil* court made this distinction by thusly noting the different remedies available to the seller when the goods are in the possession of a common carrier as opposed to when the goods are in the possession of the buyer, or the buyer's bailee:

> U.C.C. § 2–705 ... views goods given by a seller to a common carrier for delivery to a buyer as being in the possession of the carrier not the buyer, and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency. This right to stop delivery applies regardless of which party bears the risk of loss, and regardless of which party is deemed to have "title" to the goods while they are in the carrier's possession. Moreover, under the U.C.C., the right of reclamation—a different right than the right to stop goods in transit—takes effect when the buyer "receives" the goods (footnote and citation omitted).

*Id.* at 225.

■ Caselaw precedents, as well as the terms of 11 U.S.C. § 546(c)(2), clearly indicate that the right to reclamation is not absolute. Thus, where a seller's right to reclamation is superseded by the superior rights of a secured creditor or where the goods have been sold to a good faith purchaser before the reclamation demand is received, the seller may be awarded, at the court's discretion, either an administrative claim or a lien. *See In re Griffin Retreading, Inc.,* 795 F.2d 676, 679 (8th Cir.1986); *In re Marko Electronics, Inc.,* 145 B.R. 25, 27 (Bankr.N.D. Ohio 1992); *Rea Keech Buick, supra,* 139 B.R. at 629; *Diversified Food Service, supra,* 130 B.R. at 429–30; *In re Robert's Hardware Co.,* 103 B.R. 396, 399 (Bankr.N.D.N.Y.1988); *Buyer's Club Market, supra,* 100 B.R. at 36; and

*In re Holiday Meat Packing, Inc.*, 30 B.R. 737, 740 (Bankr.W.D.Pa.1983). However, before either alternative remedy may be awarded, the right to reclamation must be proven by the seller. *Griffin Retreading, supra,* 795 F.2d at 680; *Coast Trading, supra,* 744 F.2d at 692; *Leeds Bldg. Products, supra,* 141 B.R. at 267, 268; and *Diversified Food Service, supra,* 130 B.R. at 430.

The fact that this court, by its agreed Order of May 20, 1993, required the Debtor to file this adversary proceeding to determine London's reclamation rights does not alter the fact that London bears the burden of proving all of the elements of a valid reclamation right. That requirement was added merely to assure that the Debtor did not adversely affect the alleged reclaiming sellers' rights by delaying tactics.

Based upon the evidence before us, London was unsuccessful in carrying its burdens. Initially, we note that London's reliance on the Schedules and upon Owens' testimony were probably not sufficient to prove that the Debtor was insolvent at the time the goods were delivered. By Owens' own testimony, he deemed the Debtor's liabilities to exceed its assets only when the value of its assets was based upon the book value of the Debtor's assets. Book value was also used in the preparation of the Debtor's Schedules. The book value is not equivalent to the fair market value of the Debtor's assets, as indicated by Owens' testimony that the value of the Debtor's real estate is far in excess of the amount listed on the Debtor's Schedules.

■ The appropriate valuation for determining the insolvency of a debtor in a § 546(c) action, via use of the "balance sheet test," is fair valuation which "involves the estimate of what can be realized out of the assets 'within a reasonable time either through collection or sale at the regular market value, conceiving the latter as

the amount which could be obtained for the property in question within such period by a "capable and diligent businessman" from an interested buyer "who is willing to purchase under the ordinary selling conditions."'" *Storage Technology, supra,* 51 B.R. at 208, quoting 2 COLLIER ON BANKRUPTCY, ¶ 101.29[4], at 101–54 to 101–57 (15th ed. 1985). Book value, on the other hand, is the value at which assets of an entity are carried on its books, less reserve for depreciation. BLACK'S LAW DICTIONARY 165 (5th ed. 1979). Hence, in many cases, the book value of an asset will be lower than the fair market value of the asset. Thus, it is doubtful whether London satisfied the insolvency requirement of 13 Pa.C.S. § 2702(b).[1]

■ However, London's most glaring failure was its inability to prove receipt of the Accuride scrap by the Debtor prior to its demand, or, indeed, at any point in the transactions. Proof of receipt was necessary in order for London to prove that the Accuride scrap was in the possession of the Debtor at the time it received London's reclamation demands. We find that, due to the manner in which the transaction was structured, as between all three parties, it was never contemplated that the Debtor would ever receive actual, physical possession of the Accuride scrap, since the material was shipped directly to Lukens. Therefore, it did not have the requisite receipt of possession of the scrap at the crucial time of the demands for its return.

An argument cannot be made that even constructive receipt occurred, since neither CN, the common carrier, nor Lukens can be considered to have taken constructive possession of the Accuride scrap on behalf of the Debtor as a bailee. CN's possession of the scrap is foreclosed from consideration as constructive possession by virtue of the express holding of the *Marin Oil* court, *supra,* that a common carrier is not capable of receiving possession on behalf of a

---

1. We do note that the Bank is somewhat hypocritical in asserting the alleged extensive value of the Debtor's property. In the cash collateral litigation, it has vigorously sought to prove that these values are inflated. A considerable issue is raised by the Debtor and the Bank as to whether the initial, faxed demand notice of April 2, 1993, met the criteria of § 546(c)(1). We need not resolve this issue, because we find that London has no valid reclamation in any event.

buyer. 740 F.2d at 225. It is difficult to understand how an argument could be made that Lukens received the scrap on behalf of the Debtor. In fact, Lukens received the scrap on its own behalf and kept and used it. It is no answer to argue, as does London, that Lukens' right to reject deficient scrap resulted in the Debtor's effective possession of it. The reclamation right of London arises as to scrap for which Lukens *was* liable to pay, because it did *not* reject this scrap and therefore never put it in the Debtor's hands. Perhaps, if an employee of the Debtor were present at the time that each Accuride scrap shipment arrived at Lukens in order to oversee each shipment's arrival, it could be argued that the Debtor took possession of each shipment. However, there is no evidence in the record that this happened. Lukens cannot be considered anything other than what it was in the transactions in issue, *i.e.*, the ultimate buyer of the Accuride scrap. In fact, by the reasoning of *Coast Trading*, *supra*, Lukens was not merely a buyer, but rather a good faith purchaser of the scrap from the Debtor, since it bought the scrap in the ordinary course of its business.

In *Coast Trading*, the debtor, a grain broker, ordered carloads of grain from a seller for direct shipment to several stockyards, its clients. Ultimately, the debtor's drafts were dishonored. On April 7, 1982, the debtor filed for bankruptcy relief. The court found that the "stockyards' purchase of the grain precludes [the seller] from exercising any right it may have had under section 2–702 to reclaim the grain, because the stockyards [were] good faith purchasers for value under the U.C.C." 744 F.2d at 690. The court found that the seller had failed to prove that the stockyards, in purchasing the grain, failed to exhibit "honesty in fact and fair dealing." *Id.* In the present controversy, there is also no proof by London that Lukens did not exhibit honesty in fact and fair dealing when it purchased the scrap in issue. Hence, if we were to find that London had proven the elements of § 546(c), London still would be foreclosed from relief by the good faith purchase of the scrap by Lukens.

Another means by which London appears to be thwarted from reclaiming the Accuride scrap arises from the presence of the Bank's superior security interest in the scrap. By the terms of the various loan and mortgage documents, as well as by the various UCC–1 filings, the Bank is proven to have a security interest in the Debtor's present and after-acquired inventory and accounts receivables, into which categories the scrap and the proceeds for its sale arguably fell. The rights of the Bank, as a secured creditor with a superior interest, foreclose London from exercising its reclamation rights, assuming *arguendo* we had found that it possessed any such rights. *See Marko Electronics, supra,* 145 B.R. at 28–29; *Leeds Bldg. Products, supra,* 141 B.R. at 268; *Rea Keech Buick, supra,* 139 B.R. at 629; *Diversified Food Service, supra,* 130 B.R. at 429; and *In re Holiday Meat Packing, Inc.,* 30 B.R. 737, 740 (Bankr.W.D.Pa.1983). Many courts have held that the existence of a superior secured interest extinguishes a seller's reclamation rights. *See, e.g., In re Pester Refining Co.,* 964 F.2d 842, 846 (8th Cir.1992); *Marko Electronics, supra,* 145 B.R. at 28–29; and *Leeds Bldg. Products, supra,* 141 B.R. at 268–69.

Because London has failed to prove that it is entitled to reclamation rights under § 546(c), London is also foreclosed from seeking an administrative priority claim pursuant to 11 U.S.C. § 546(c)(2)(A) as an alternative remedy. Award of an administrative priority claim under § 546(c)(2)(A) is in lieu of, not in addition to, a right to reclaim goods. *See Griffin Retreading, supra,* 795 F.2d at 680; *Coast Trading, supra,* 744 F.2d at 692; *Leeds Bldg. Products, supra,* 141 B.R. at 268; *Diversified Food Service, supra,* 130 B.R. at 430; and *In re Flagstaff Foodservice Corp.,* 14 B.R. 462, 467 (Bankr.S.D.N.Y.1981).

Therefore, our determination that London does not have valid reclamation rights against the Debtor cuts deeply across all of its claims, not only in the proceeding, but also in its Motion. However, we will briefly discuss—and dismiss—London's additional claims of rights to an administrative

claim under 11 U.S.C. § 503(b)(1)(A), apart from its reclamation claims, and its claims under 11 U.S.C. §§ 365(d)(2) and 362(d).

### 2. LONDON HAS NOT ESTABLISHED ITS RIGHT TO ADMINISTRATIVE CLAIM STATUS, NOR ITS RIGHTS TO RELIEF UNDER §§ 365(d)(2) and 362(d).

As an alternative to seeking an administrative claim under the specific language relating to reclamation claimants in 11 U.S.C. § 546(c)(2)(A), London argues that it is entitled to an administrative claim under the general language in 11 U.S.C. § 503(b)(1)(A), which provides that administrative expenses are allowable for "the actual necessary costs and expenses of preserving the estate of" a debtor-in-possession. London argues that its supply of Accuride scrap to the Debtor helped to preserve the estate by allowing the Debtor to generate proceeds from its resale to Lukens.

■ Although London's reasoning is logical, it must be recalled that

> [c]ourts have generally held that "[s]tatutory priorities are to be narrowly construed because the presumption in bankruptcy cases is that the debtor's limited resources be equally distributed among his creditors." *In re Consolidated Oil & Gas, Inc.*, 110 B.R. 535, 537 (Bankr. D.Colo.1990), quoting *In re Amarex*, 853 F.2d 1526, 1530 (10 Cir.1988). *See also, e.g., In re Metro Transportation Co.*, 117 B.R. 143, 154 (Bankr.E.D.Pa.1990), quoting *In re Great Northeastern Lumber & Millwork Corp.*, 64 B.R. 426, 427 (Bankr.E.D.Pa.1986) (GOLDHABER, CH. J.).

*In re Philadelphia Mortgage Trust*, 117 B.R. 820, 826 (Bankr.E.D.Pa.1990). The limitation on administrative claims which is relevant here is the principle that administrative claims must be post-petition claims, as opposed to pre-petition claims. *Id.* at 828. It is only post-petition claims which benefit and preserve the estate of the *debtor-in-possession*, as opposed to merely benefitting the predecessor, pre-petition debt-

or, which is not the beneficiary referenced in § 503(b)(1)(A).

Also, we note that it is only post-petition benefits and services which satisfy the underlying purpose of allowing a preference to administrative claims, *i.e.*, encouraging the provision of benefits and services to a party publicly declaring its financial difficulties by filing bankruptcy. *See In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr.E.D.Pa.1987).

■ In its Motion, London specifically asserts an administrative claim of $55,000, arising from the Balance Due under the five shipments referenced at page 6 *supra*. The difficulty with this claim is that, while the deliveries of these shipments to Lukens all occurred post-petition, the deliveries of the shipments *to CN by London* all occurred pre-petition. As the UCC provides, at 13 Pa.C.S. § 2401(2), "[u]nless otherwise specifically agreed title passes to the buyer at the time and place at which *the seller completes his performance* with respect to delivery of the goods, . . ." (emphasis added). Although London argues that delivery was not complete until the scrap reached Lukens, we believe that this argument is factually inaccurate. London completed *its* performance with respect to delivery as soon as it loaded CN's cars. Lukens did not reject the shipments in issue. Therefore, the sales of the scrap in issue in these five shipments occurred pre-petition. As a result, London's claims arising from these shipments cannot be categorized as administrative claims.

We further note that the policies behind allowance of special priority to administrative claims would not be served by a ruling that London's claims arising from the five shipments in issue were within the scope of § 503(b)(1)(A). All of London's deliveries were made to the pre-petition debtor. As soon as London became aware of the Debtor's financial distress, it endeavored to reclaim the goods delivered and ceased doing business with the Debtor. London therefore did not continue to provide any services or benefits to the Debtor, qua debtor-in-possession, post-petition, in contrast to, for example, the creditor seeking administra-

tive claim status in *Grant Broadcasting, supra.* London's abrupt discontinuance of its business relationship with the Debtor after its bankruptcy filing also serves to considerably blunt the "moral imperative" which London argues favors granting priority to its claims. No administrative claims will therefore be allowed to London.

In the Motion, London also seeks to compel the Debtor to reject the Contract, which it asserts is executory. As the Debtor and the Bank accurately point out, assuming that the Contract is executory, this aspect of the Motion is technically improper, because a debtor always retains the choice to assume or reject an executory contract. However, if the Contract is deemed executory, London can accomplish, in a practical sense, the same result by requiring the Debtor to either assume or reject the Contract in a specific time-period pursuant to 11 U.S.C. § 365(d)(2), which provides as follows:

> (2) in a case under chapter ... 11, ... of this title, the trustee may assume or reject an executory contract ... at any time before the confirmation of a plan but the court, on the request of any party to such contract ... may order the trustee to determine within a specified period of time whether to assume or reject such contract
>
> ....

We will consider this aspect of the Motion as a request for relief under § 362(d)(2).

■ Although the Debtor and the Bank both appear to concede that the Contract is executory, there are two reasons why we have some independent doubts about the accuracy of this assumption. A contract is executory only when "performance remains due to some extent on both sides," *Counties Contracting & Construction Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1060 (3rd Cir.1988), and when a contract is "characterized by reciprocal obligations continuing in the future." *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3rd Cir. 1989).

The Debtor's role, as a co-broker, was to "bring together" a willing buyer and a willing seller for the Accuride scrap, and, subsequent to making the match, act as a "go-between" in the transaction. Its services were comparable to that of a "finder," whose only engagement is bringing the parties to a contractual relationship together. *See In re TM Carlton House Partners, Ltd.,* 108 B.R. 512, 517 (Bankr. E.D.Pa.1989), *aff'd,* 114 B.R. 81 (E.D.Pa. 1990), *aff'd,* 928 F.2d 1131 (3rd Cir.1991). It is also clear that, as of April 3, 1993, the Debtor had already performed the primary function required of it, *i.e.,* bringing together London and Lukens as the seller and buyer, respectively, of the Accuride scrap.

■ While it is true that, under the Contract, the Debtor had the continuing responsibility of paying freight charges, a debtor's continuing obligation to merely make payments pursuant to contractual terms does not render a contract executory. *See In re Herbert,* 806 F.2d 889, 893 (9th Cir.1986); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985), *cert. denied sub nom. Lubrizol Enterprises, Inc. v. Canfield,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); and *In Sholos,* 11 B.R. 782, 786 (Bankr.W.D.Pa.1981). Furthermore, the Debtor's responsibility to pay the freight charges was eliminated by the Stipulation, as approved by this court on May 20, 1993.

The presence of the Stipulation constitutes the second reason why the Contract may be deemed non-executory. The Stipulation arguably superseded the Contract and rendered it no longer operable in and of itself. If the Contract were superseded, it no longer existed *per se,* and hence it was not a viable executory contract which could, at that time, be assumed or rejected.

■ However, putting aside the questions of whether the Contract remains effective and, if so, remains executory, we do not believe that London has met its burden of establishing its entitlement to relief under 11 U.S.C. § 365(d)(2). As we stated in *In re St. Mary Hospital,* 89 B.R. 503, 513

(Bankr.E.D.Pa.1988), citing *Grant Broadcasting, supra,* 71 B.R. at 902,

> a § 365(d)(2) motion must be resolved by weighing " ' "the nature of the interests at state, the balance of hurt to the litigants, the good to be achieved, and the safeguards afforded those litigants." ' "

71 B.R. at 902 (quoting to *In re Lionel Corp.,* 23 B.R. 224, 225 (Bankr.S.D.N.Y. 1982), which in turn was quoting *In re Midtown Skating Corp.,* 3 B.R. 194, 198 (Bankr.S.D.N.Y.1980)). Of course, in deciding a § 365(d)(2) motion and weighing these considerations, a bankruptcy court is empowered to deny the motion and allow the debtor to wait until the normal deadline of confirmation to assume or reject the contract. *See, e.g., [In re] Whitcomb & Keller [Mortgage Co.],* 715 F.2d [375] at 379 [ (7th Cir.1983) ]; *In re Dunes Casino Hotel,* 63 B.R. 939, 949–50 (D.N.J.1986); and *[In re] Wheeling–Pittsburgh [Steel Corp.],* ... 54 B.R. [385] at 388–89 [ (Bankr.W.D.Pa.1985) ].

If the Debtor rejected the Contract (assuming *arguendo* that by doing so it would also terminate the Stipulation), it would arguably lose the $3.00/ton commissions which it is currently being paid by Lukens under the terms of the Stipulation. Since the Debtor was a "finder-broker" in this transaction, it is entitled to these commissions for the Contract period, even if it is no longer actively performing services. Under these circumstances, it hardly seems inequitable for it to continue receiving these payments.

On the other hand, London is protected from future losses or payment delays by the terms of the Stipulation. It must be recalled that, while not required to do so, London has chosen to continue to do a substantial business with Lukens under the terms of the Stipulation. What London apparently would like to accomplish is retention of its relationship with Lukens, but elimination of its liability to "pay the piper" and make future commission payments to the Debtor pursuant thereto. At the very least, it would like to set off those commission payments against the Debtor's pre-petition indebtedness to it.

When viewed in this light, the "moral imperative" invoked by London is something less than appealing. Unlike Lukens, which is willing to honor its commitment to pay its share of commissions to the Debtor, London seeks to avoid its continuing responsibility to pay its share of these commissions. It is no answer to argue, as it does, that it is a creditor (among many others) which will probably be paid less than the full amount owed to it under the terms of any reorganizational plan of the Debtor. The "balance of hurt" therefore does not weigh on the side of London.

Furthermore, it is not inequitable to require London to wait until the date of confirmation of a plan to see whether the Debtor will assume or reject the Contract, assuming that it is a viable executory contract. The pressure placed upon the Debtor by the Bank and the Committee is unlikely to result in a long perpetuation of dormant exclusivity. London itself purports to be the co-proponent of a prospective plan. It is therefore appropriate to allow the Debtor the normal period of time, *i.e.,* until confirmation, to decide if it is appropriate to assume or reject the Contract, assuming again that the Contract is deemed to be not superseded and executory and must be assumed or rejected at all.

The final issue remaining is whether London is entitled to relief from the automatic stay to terminate the Contract. We do not agree with the Debtor and the Bank, assuming *arguendo* that the Contract is executory, that London is thereby precluded from invoking 11 U.S.C. § 362, and is restricted to utilizing 11 U.S.C. § 365 to achieve a remedy. *See Grant Broadcasting, supra,* 71 B.R. at 901.

Rather, in analyzing this issue, we begin by recalling that London is merely an unsecured creditor seeking relief under § 362(d), as it is not entitled to a lien under 11 U.S.C. § 546(c)(2)(B). Therefore, London is entitled to relief from the automatic stay "only if the balance of hardships tips in [its] favor." *In re Hunt's Pier Associates,* 143 B.R. 36, 50 (Bankr.E.D.Pa. 1992). *Accord, In re Metro Transporta-*

*tion Co.,* 82 B.R. 351, 355 (Bankr.E.D.Pa. 1988); and *In re Ronald Perlstein Enterprises, Inc.,* 70 B.R. 1005, 1010 (Bankr. E.D.Pa.1987). Typically, such relief has been granted only when there is a coalescence of two factors:

> (1) the Debtor has engaged in morally culpable conduct which the moving party seeks to undo in a court action; and (2) the creditor does not seek to pursue assets of the estate or is prohibited from doing so, although given relief to pursue certain remedies against the debtor.

*In re Cherry,* 78. B.R. 65, 72 (Bankr. E.D.Pa.1987); and *Ronald Perlstein, supra,* 70 B.R. at 1009.

■ In the instant record, London has failed to prove that the Debtor engaged in any manner of morally culpable behavior. We do not deem the Debtor's failure to pay London for pre-petition or post-petition shipments of Accuride scrap; its receiving the $3.00/ton commission from Lukens without its continuing to perform any services; and its alleged improbability of reorganizing or effectuating a feasible plan to be in any way morally culpable, either singly or in combination, so as to justify allowing London relief from the automatic stay.

In considering the second typical factor present when § 362(d) relief has been granted to an unsecured creditor, we note that London is seeking relief from the automatic stay specifically to prevent the Debtor from continuing to receive commissions, the proceeds of which are a valuable asset of the Debtor's estate. London seeks to terminate the Debtor's rights principally because the Contract is not as profitable to London as it would be if payment of the Debtor's commissions were eliminated. This is not an equitable result.

We therefore find that the "balance of hardships" between it and the Debtor does not tip in favor of London. We will therefore not grant London relief from the automatic stay.

## D. CONCLUSION

An Order consistent with the foregoing conclusions will be entered.

### ORDER

AND NOW, this 18th day of August, 1993, after a consolidated trial/hearing on the Motion of London Salvage & Trading Co., Ltd. ("London") to Compel Rejection of Executory Contract; for Relief from Automatic Stay to Terminate Contract; and Request for Payment of Administrative Claim ("the Motion") in the main case of MAYER POLLOCK STEEL CORPORATION ("the Debtor") and the above-entitled adversary proceeding, as to London, on June 23, 1993, and upon review of the interested parties' post-trial/hearing submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiffs and against London in the Proceeding.

2. It is DECLARED that London has no valid reclamation claim against the Debtor.

3. All relief sought by London in the Motion is DENIED.